# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# CORPUS CHRISTI DIVISION

| | |
|---|---|
| LIONEL LOPEZ; ISABELA ARAIZA; ARLENE LIRA EASTER; ALICIA BENAVIDEZ; ANDRES ROSAS; LENA LORRAINE LOZANO SOLIS; and CARMEN RODRIGUEZ,<br><br>        Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas; and CARLOS CASCOS, in his official capacity as Texas Secretary of State,<br><br>        Defendants. | Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

1. The Supreme Court of Texas ("Supreme Court") and the Texas Court of Criminal Appeals ("Court of Criminal Appeals") are the courts of last resort in Texas. They are the final authorities on questions of Texas civil and criminal law, respectively. Together, the two courts render enormously consequential decisions that profoundly affect the lives of all Texans.

2. According to the 2010 Census, Latinos, a significant and rapidly growing racial group, constitute 37.6 percent of Texas's total population and 26.5 percent of Texas's citizen voting age population. However, Latinos have been prevented from participating fully in the election of Texas's high court judges because of the way those judges are elected. That election method, in which all judges for both courts are elected in at-large statewide elections, unlawfully dilutes the voting strength of Latino citizens and prevents them from electing their candidates of choice.

3. The Supreme Court and Court of Criminal Appeals each has nine members. Because

1

voting is racially polarized, that is, white voters as a group and Latino voters as a group consistently prefer different candidates, the at-large method of election functions to deprive more than one-quarter of the State's eligible voting age population from electing judges of their choice to *any* of the eighteen seats on the two courts.

4. The Latino population and citizen voting age population are sufficiently large and geographically compact to constitute a majority in at least two fairly-drawn single-member districts; the State's Latinos are politically cohesive; and the State's white citizen voting age majority votes sufficiently as a bloc to enable it usually to defeat Latino voters' preferred candidates.  Because of these circumstances, as well as the historical, socioeconomic, and electoral conditions of Texas, the at-large election method for the Supreme Court and Court of Criminal Appeals violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2").  *Thornburg v. Gingles*, 478 U.S. 30 (1986).

5. For these reasons, plaintiffs respectfully pray for this Court to issue: (1) a declaratory judgment that the use of at-large elections for the Supreme Court of Texas and the Texas Court of Criminal Appeals violates Section 2 of the Voting Rights Act; (2) an injunction against the further use of at-large elections for the Supreme Court and the Court of Criminal Appeals; (3) an order requiring future elections for the Supreme Court and the Court of Criminal Appeals to be conducted under a method of election that complies with the Constitution and the Voting Rights Act; (4) an award of costs and reasonable attorneys' fees to plaintiffs, including expert witness fees; and (5) such additional relief as is appropriate.

## JURISDICTION

6. This Court has jurisdiction over this action pursuant to (1) 28 U.S.C. § 1343(a), because this action seeks to redress the deprivation, under color of state law, of rights, privileges and

immunities secured by the Voting Rights Act; and (2) 28 U.S.C. § 1331 because this action arises under the laws of the United States.

7. This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

8. This Court has personal jurisdiction over the Defendants.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

**The Plaintiffs**

10. Plaintiff LIONEL LOPEZ is an adult Latino United States citizen who is a resident of and registered voter in Nueces County, Texas.

11. Plaintiff ISABEL ARAIZA is an adult Latina United States citizen who is a resident of and a registered voter in Nueces County, Texas.

12. Plaintiff ARLENE LIRA EASTER is an adult Latina United States citizen who is a resident of and a registered voter in Nueces County, Texas.

13. Plaintiff ALICIA BENAVIDEZ is an adult Latina United States citizen who is a resident of and a registered voter in Nueces County, Texas.

14. Plaintiff ANDRES ROSAS is an adult Latino United States citizen who is a resident of and a registered voter in Nueces County, Texas.

15. Plaintiff LENA LORRAINE LOZANO SOLIS is an adult Latina United States citizen who is a resident of and a registered voter in Nueces County, Texas.

16. Plaintiff CARMEN RODRIGUEZ is an adult Latina United States citizen who is a resident of and a registered voter in El Paso County, Texas.

**The Defendants**

17. Defendant GREG ABBOTT is the Governor of the State of Texas and is sued in his official capacity. Pursuant to Article IV, Section I of the Texas Constitution, the governor is the chief executive officer of the State of Texas.

18. Defendant CARLOS CASCOS is the Secretary of State of the State of Texas and is sued in his official capacity. The Secretary of State is the State's chief election officer, TEX. ELEC. CODE ANN. § 31.001, and as such is responsible for "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of [Texas election laws]." *Id.* § 31.003.

## FACTS AND BACKGROUND

19. Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [a minority] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b). An electoral regime that dilutes the voting strength of a minority community may deprive the members of that community of having an equal opportunity to elect representatives of their choice under Section 2. Section 2 applies to the election of judges. *Chisom v. Roemer*, 501 U.S. 380 (1991).

20. The Texas Supreme Court is the court of last resort for civil cases in Texas. The chief justice and eight justices of the Supreme Court are elected at-large to six-year, staggered terms. The chief justice is elected to a designated position and the remaining justices are elected to numbered places that have no functional significance.

21. The Texas Court of Criminal Appeals is the court of last resort for criminal cases in Texas. The presiding judge and eight judges of the Court of Criminal Appeals are also elected at-large to six-year, staggered terms. The presiding judge is elected to a designated position and the remaining justices are elected to numbered places that have no functional significance.

22. Elections for the Texas Supreme Court and Court of Criminal Appeals are partisan, and primary elections are held to determine which candidates advance to the general election. Primary elections must be won with a majority of the vote; if no candidate receives a majority, there is a runoff between the top two vote-getters.

23. When vacancies arise on either court, the governor appoints a replacement. The appointee serves on the court until the next succeeding general election at which he or she may stand for election to fill the vacancy for the unexpired term.

24. The at-large method of electing judges to the two high courts submerges Latino voters so that they are rendered ineffective electoral minorities in most every election for both courts.

25. The at-large method of election violates Section 2 of the Voting Rights Act because it denies Texas's Latino voters an equal opportunity to participate in the political process and elect judges of their choice.

**Texas Demographics**

26. Texas is the second largest state in the country, with a population of 25,145,561 as of 2010. *Texas Population, 2010*, TEX. DEP'T OF STATE HEALTH SERVS., https://www.dshs.state.tx.us/chs/popdat/st2010c.shtm (last updated March 26, 2014). Texas's Latino population has grown rapidly in recent years, from 32.0 percent of Texans in 2000 to 37.6 percent in 2010. Over the same period, the white population declined from 53.1 percent to 45.3

percent.   *Id.*; *Texas Population, 2000*, TEX. DEP'T OF STATE HEALTH SERVS., https://www.dshs.state.tx.us/chs/popdat/ST2000.shtm (last updated February 18, 2011).

27.   Texas's Latino citizen voting age percentage is lower than the percentage of the State's total population that is Latino.  According to the U.S. Census' 2008-2012 American Community Survey, which averages citizen voting age population over a five-year span, the Latino citizen voting age population amounts to 26.5 percent.  Texas's white citizen voting age population during the same period was 56.4 percent.

28.   The Latino population is concentrated in the south and west parts of Texas, specifically west of the Pecos River as well as in and south of San Antonio.

29.   The population and the racial demographics for Texas, which are the basis for plaintiffs' proposed alternative redistricting plans, are as follows:

**Table 1 – Texas Population by Race**

|  | Total Population – 2010 Census | | Citizen Voting Age Population – 2008-2012 ACS | |
|---|---|---|---|---|
| White alone, not Hispanic or Latino | 11,397,345 | 45.3% | 8,965,260 | 56.4% |
| Hispanic or Latino | 9,460,921 | 37.6% | 4,209,595 | 26.5% |
| Other | 4,287,295 | 17.1% | 2,716,255 | 17.1% |
| Total | 25,145,461 | | 15,891,110 | |

**Texas Supreme Court and Court of Criminal Appeals Election History**

30.   Latino candidates for the Supreme Court and Court of Criminal Appeals have had quite limited success.

31.   From 2002 to present, the Supreme Court has had only three Latino justices while the Court of Criminal Appeals has had just one Latino judge.

32.   Over that same time period, the Supreme Court has had 17 white justices and the Court of Criminal Appeals has had 12 white judges.

33. On information and belief, since 1945, only five of the 76 justices to serve on the Supreme Court, a mere 6.6 percent, were Latino. During the same period, 69 of those 76 justices, or 89.5 percent, were white.

34. On information and belief, since 1945, only two of the 48 judges to serve on the Court of Criminal Appeals, or 4.2 percent, were Latino. During the same period, 44 of those 48 judges, or 91.7 percent, were white.

35. No Latino candidate has ever won election to either court without first being appointed by the governor.

36. Even among the elected Latino judges, few, if any, were the Latino community's candidate of choice.

37. From 2002 to 2014, Latino candidates ran for election to the Supreme Court ten times. Only two candidates were successful. One successful candidate was unopposed in the primary and did not face a major party candidate in the general election. The other candidate was not the Latino community's candidate of choice.

38. From 2002 to 2014, Latino candidates ran for election to the Court of Criminal Appeals five times. Only one of these candidates was successful. That candidate was unopposed in the primary and did not face a major party candidate in the general election.

39. A statistical analysis demonstrates that voting patterns in Supreme Court and Court of Criminal Appeals elections are racially polarized, with Latino voters consistently voting for a particular (usually Latino) candidate of choice. White bloc voting in support of their preferred candidates has repeatedly led to the defeat of candidates preferred by Latino voters.

### *Thornburg v. Gingles*

40.     The United States Supreme Court, in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986), identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act:

>   (1) The minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district";
>
>   (2) The minority group must be "politically cohesive"; and
>
>   (3) The majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

41.     Texas's Latino population and citizen voting age population are sufficiently numerous and geographically compact to form a majority of the total population and citizen voting age population in at least two properly-apportioned single-member Supreme Court and Court of Criminals Appeals districts in nine-district plans.

42.     Alternatively, Texas's Latino population and citizen voting age population are sufficiently numerous and geographically compact to form a majority of the total population and citizen voting age population in at least two properly-apportioned single-member Supreme Court and Court of Criminals Appeals districts in eight-district plans.

43.     Texas's Latino voters are politically cohesive as a single minority group.  Together, they vote overwhelmingly for different candidates than those supported by white voters.

44.     Texas's white electorate votes as a bloc in support of different candidates than those supported by Latino voters.  Bloc voting by white members of the electorate consistently defeats the candidates preferred by Latino voters.

### Section 2's Totality of the Circumstances Analysis

45. In addition to the presence of the three *Gingles* preconditions, the totality of the circumstances in this case supports plaintiffs' claim that Latino voters have less opportunity than other members of the electorate to participate in the political process and elect candidates of choice to the Supreme Court and Court of Criminal Appeals in violation of Section 2 of the Voting Rights Act.

46. The history of state-sponsored voting discrimination in Texas is well documented. At different points in its history, Texas has utilized all-white primaries, poll taxes, and burdensome restrictions on voter registration. Texas has also been found to have violated the Voting Rights Act in every redistricting cycle since 1970 through the use of racially gerrymandered districts.

47. Additionally, between 1976 and 2013, the Department of Justice ("DOJ") issued more than 200 letters to Texas jurisdictions objecting to various forms of discrimination under Section 5 of the Voting Rights Act. DOJ, CIVIL RIGHTS DIV., VOTING DETERMINATION LETTERS FOR TEXAS, https://www.justice.gov/crt/voting-determination-letters-texas (last updated Aug. 7, 2015). Among many other practices, the DOJ objected to Texas's discriminatory absentee voting practices, discriminatory redistricting practices, and discriminatory implementation of majority vote requirements. *Id.* A report from the National Commission of Voting Rights also found that from 1995 to June 2014, there were 88 Section 2 cases brought against Texas that defendants lost or settled. NATIONAL COMMISSION ON VOTING RIGHTS, PROTECTING OUR VOTERS 2014: OUR WORK IS NOT DONE app. at 13–21 (2014) (Voting Rights Litigation by State).

48. As described above, voting in Texas is racially polarized. Furthermore, in *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 438 (2006), the U.S. Supreme Court accepted the presence of racially polarized voting throughout the State.

9

49. Texas employs a number of practices and procedures that enhance the opportunity for discrimination against Latinos. The state imposes a majority-vote requirement in primary elections, uses staggered terms and numbered-place requirements that function as anti-single shot provisions, operates elections on an at-large basis, and as the second largest and second most populous state in the country, uses unusually large election districts.

50. As a result of the history of official and private discrimination, Latino residents of Texas have a lower socioeconomic status and lag behind white residents in a wide range of areas, including employment, income, education, and access to health care.

51. The effects of discrimination are still disproportionately borne by Latino residents of Texas in areas such as education and employment.  Latino residents are more than three and a half times as likely as their white counterparts to have less than a high school diploma. U.S. CENSUS BUREAU, 2014 AMERICAN COMMUNITY SURVEY 1-YEAR ESTIMATES, tbls.C15002H & C15002I (2015). Latino residents also have a poverty rate over twice as high as white residents. *Id.* tbl.S1701. Additionally, Latinos are less than half as likely as white residents to live in a home they own. U.S. CENSUS BUREAU, 2010 CENSUS SUMMARY, tbl.QT-H1 (2011).

52. The U.S. Supreme Court has acknowledged the reality of socio-economic disparities for Latino residents in Texas, noting that the "'political, social, and economic legacy of past discrimination' for Latinos in Texas . . . may well 'hinder their ability to participate effectively in the political process.'" *League of United Latin Am. Citizens*, 548 U.S. at 440 (quoting *Gingles*, 478 U.S. at 45).

53. Texas's Latino voters have lower rates of registration and turnout than their white counterparts.  As of 2014, only 46.2 percent of eligible Latinos were registered in Texas, as compared to 66.2 percent of eligible non-Latino whites.  In that year, only 48.4 percent of

registered Latinos voted, while 63.1 percent of registered non-Latino whites cast a ballot. U.S. CENSUS BUREAU, VOTING AND REGISTRATION IN THE ELECTION OF NOVEMBER 2014 (2015), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html.

54. Elections for the Supreme Court and Court of Criminal Appeals have been marked by racial appeals.

55. Latinos are drastically underrepresented among elected officials in Texas.

56. The Supreme Court and Court of Criminal Appeals often render decisions that affect the lives of members of Texas's Latino community directly, particularly, and significantly. For example, in *Morath v. The Texas Taxpayer & Student Fairness Coalition*, No. 14-0776, 2016 WL 2853868 (Tex. May 13, 2016), the Supreme Court unanimously reversed a finding that the State's school funding system was unconstitutional for, among other reasons, failing to provide adequate resources for English language learner (ELL) and economically disadvantaged students. Latinos account for over 90 percent of ELL students, and over 67 percent of economically disadvantaged students in Texas. TEXAS EDUCATION AGENCY, ENROLLMENT IN TEXAS PUBLIC SCHOOLS, 2014–15 10–12, 26 (2016), http://tea.texas.gov/acctres/enroll_2014-15.pdf. As another example, in *Saldano v. State*, 70 S.W.3d 873, 875 (Tex. Crim. App. 2002), the Court of Criminal Appeals failed to appreciate the harm of courtroom prejudice against Latino defendants. The defendant in the case, Victor Saldano, had been sentenced to death. The Texas Attorney General "confessed that the prosecution's introduction of race as a factor for determining 'future dangerousness,' constituted a violation of [Saldano's] rights to equal protection and due process." In light of that confession, the U.S. Supreme Court vacated the judgment and sent the case to the Court of Criminal Appeals for further consideration. Despite the Attorney General's admission, the Court of Criminal Appeals affirmed the trial court's judgment and the death sentence.

## COUNT ONE:
## VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT OF 1965

57. Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 56 above, as if fully set forth herein.

58. As explained above, Texas's Latino population is sufficiently numerous and geographically compact to allow for the creation of at least two properly-apportioned single-member districts for electing members to the Supreme Court and the Court of Criminal Appeals in nine-district plans. Alternatively, Texas's Latino population is sufficiently numerous and geographically compact to allow for the creation of at least two properly-apportioned single-member districts in eight-district plans. In these remedial districts, the Latino population constitutes a majority of the total population and the citizen voting age population. Texas's Latino voters are politically cohesive, and elections for both courts at issue reflect a clear pattern of racially polarized voting that allows the bloc of white voters to usually defeat the Latino community's preferred candidate. These facts satisfy the three "*Gingles* preconditions."

59. As explained in detail above, the totality of the circumstances establishes that the use of an at-large method of electing members of the Supreme Court and Court of Criminal Appeals has the effect of denying Latino voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

60. Unless enjoined by order of this Court, Defendants will continue to act in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Supreme Court and Court of Criminal Appeals using an unlawful election method.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that the Court:

    a.    Declare that the use of at-large elections to elect the Supreme Court and Court of Criminal Appeals violates Section 2 of the Voting Rights Act;

    b.    Enjoin Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections for the Supreme Court and Court of Criminal Appeals under the current method of election;

    c.    Order the implementation of a new method of election for the Supreme Court and Court of Criminal Appeals that complies with the Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

    d.    Award plaintiffs their reasonable attorneys' fees, pursuant to statute, and the costs and disbursements of maintaining this action, such as expert fees; and

    e.    Order such additional relief as the interests of justice may require.

Dated: July 20, 2016                    Respectfully submitted,

                                        By:   /s/ Lindsey B. Cohan
                                        Amy L. Rudd
                                        amy.rudd@dechert.com
                                        State Bar No. 24043561
                                        Lindsey B. Cohan
                                        lindsey.cohan@dechert.com
                                        State Bar No. 24083903
                                        S.D. Texas Bar No. 2319985
                                        Dechert LLP
                                        500 W. 6th Street, Suite 2010
                                        Austin, Texas 78701
                                        Telephone: (512) 394-3000
                                        Facsimile: (512) 394-3001

Jose Garza
State Bar No. 07731950
jgarza@ggmtx.com
Martin Golando
marty@ggmtx.com
State Bar No. 24059153
Michael P. Moran
michael@ggmtx.com
State Bar No. 24092857
Rolando L. Rios
State Bar No. 16935900
rrios@rolandorioslaw.com
Joaquin G. Avila
State Bar No. 01456150
firm@ggmtx.com
Garza Golando Moran, PLLC
115 E. Travis St., Ste. 1235
San Antonio, Texas 78205
Telephone: (210) 892-8543
Facsimile: (210) 428-6448


Neil Steiner, Esq. (*pro hac vice – to be filed*)
neil.steiner@dechert.com
May Chiang, Esq. (*pro hac vice – to be filed*)
may.chiang@dechert.com
Shriram Harid, Esq. (*pro hac vice – to be filed*)
shriram.harid@dechert.com
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Telephone: (212) 698-3822
Facsimile: (212) 698-3599

Jon Greenbaum, Esq. (*pro hac vice – to be filed*)
jgreenbaum@lawyerscommittee.org
Ezra D. Rosenberg, Esq. (*pro hac vice – to be filed*)
erosenberg@lawyerscommittee.org
Brendan Downes, Esq. (*pro hac vice – to be filed*)
bdownes@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., NW, Suite 400
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857