**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|  |  |
|---|---|
| LA UNION DEL PUEBLO ENTERO, INC. ("LUPE"); LIONEL LOPEZ; ISABELA ARAIZA; ARLENE LIRA EASTER; ALICIA BENAVIDEZ; ANDRES ROSAS; LENA LORRAINE LOZANO SOLIS; and CARMEN RODRIGUEZ,<br><br>       Plaintiffs,<br><br>v.<br><br>STATE OF TEXAS; GREG ABBOTT, in his official capacity as Governor of Texas; and CARLOS CASCOS, in his official capacity as Texas Secretary of State,<br><br>       Defendants. | Case No. 2:16-CV-00303 |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS AND OF THE CASE ................................................... 1

ARGUMENT ............................................................................................................ 2

    I.      PLAINTIFFS HAVE ADEQUATELY PLEADED STANDING ........................ 2

           A.     The Individual Plaintiffs Have Standing..................................................... 3

           B.     LUPE Has Standing .................................................................................... 7

                 1.     LUPE's members have standing. .................................................... 8

                 2.     Challenging the judicial election system is germane to LUPE's purpose. ........................................................................... 8

                 3.     The Participation of LUPE's Members is not required. ............... 9

    II.     THE COMPLAINT STATES A PRIMA FACIE CASE UNDER SECTION 2 OF THE VOTING RIGHTS ACT ................................................. 9

           A.     Plaintiffs' Complaint Pleads Sufficient Facts that Support the Claim for Relief ......................................................................................... 10

           B.     Appellate Judicial Elections Must Comply with the Voting Rights Act........................................................................................................ 11

           C.     Defendants Improperly Rely on Inapposite Case Law to Argue that Any Remedy Here is Prohibited ............................................................. 13

           D.     Defendants Bear the Burden of Demonstrating that Partisan Politics, and not Race, Best Explains Patterns of Racially Polarized Voting ......................................................................................................... 16

           E.     Defendants' Arguments Concerning Judicially Manageable Standards Were Expressly Rejected in Chisom....................................... 16

           F.     Defendants' Remaining Arguments are Without Merit.......................... 17

CONCLUSION........................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009).............................................................................................10

*Baker v. Carr,*
 369 U.S. 186 (1962)...............................................................................................3

*Bell Atlantic Corp. v. Twombley,*
 550 U.S. 544 (2007)..............................................................................................10

*Chisom v. Roemer,*
 501 U.S. 380 (1991).................................................................................. *passim*

*Cousin v. Sundquist,*
 145 F.3d 1414 (6th Cir. 1998) ......................................................................14, 15

*Davis v. Chiles,*
 139 F.3d 1414 (11th Cir. 1998) ....................................................................14, 15

*Houston Lawyers' Association v. Attorney General of Texas,*
 501 U.S. 419 (1991).............................................................................13, 14, 15

*Hunt v Washington,*
 432 U.S. 333 (1977).................................................................................................8

*Johnson v. De Grandy,*
 512 U.S. 997 (1994)......................................................................................10, 18

*League of United Latin Am. Citizens v. Perry,*
 548 U.S. 399 (2006).................................................................................................9

*League of United Latin Am. Citizens #4552 v. Roscoe Indep. Sch. Dist.,*
 123 F.3d 843 (5th Cir. 1997) ...............................................................................9

*League of United Latin Am. Citizens, Council No. 4386 v. Midland Ind. Sch. Dist.,*
 829 F.2d 546 (5th Cir. 1987) ...............................................................................9

*League of United Latin Am. Citizens, Council No. 4434 v. Clements,*
 999 F.2d 831 (5th Cir. 1993)..................................................................3, 14, 15

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne,*
 659 F.3d 421 (5th Cir. 2011) ...............................................................................3

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*,
    675 F.3d 433 (5th Cir. 2012) ...............................................9

*Leal v. McHugh*,
    731 F.3d 405 (5th Cir. 2013) .............................................10

*Little v. KPMG LLP*,
    575 F.3d 533 (5th Cir. 2009) ...............................................2

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).......................................................2, 3, 4

*Miller v. Alabama*,
    515 U.S. 900 (1995)..........................................................18

*N.A.A.C.P. v. Fordice*,
    105 F.3d 655 (5th Cir. 1996) ...............................................9

*Nipper v. Smith*,
    39 F.3d 1494 (11th Cir. 1994) .......................................14, 15

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ...............................................2

*S. Christian Leadership Conf. of Ala. v. Sessions*,
    56 F.3d 1281 (11th Cir. 1995) .......................................14, 15

*Saldana v State*,
    70 S.W.3d 873 (Tex. Crim. App. 2002)..................................9

*Shambaugh v. Scofield*,
    132 F.2d 345 (5th Cir. 1943) .............................................12

*Teague v. Attala Cnty., Miss.*,
    92 F.3d 283 (5th Cir. 1996) ...............................................16

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)................................................. *passim*

*True v. Robles*,
    571 F.3d 412 (5th Cir. 2009) .............................................10

*United States v. Hays*,
    515 U.S. 737 (1995).........................................................6

*United States v. Leach*,
    639 F.3d 769 (7th Cir. 2011) .............................................13

*Valdespino v. Alamo Heights Indep. Sch. Dist.*,
    168 F.3d 848 (5th Cir. 1999) ...............................................................6

*Warth v. Seldin*,
    422 U.S. 490 (1975) ..................................................................2, 8

*Westwego Citizens for Better Gov't v. City of Westwego*,
    946 F.2d 1109 (5th Cir. 1991) ...............................................................9

*White v. Regester*,
    412 U.S. 755 (1973) ...............................................................17

**Statutes**

52 U.S.C. § 10301 ...............................................................18

**Other Authorities**

Federal Rule of Civil Procedure 8 ...............................................................10

La. Const. art. V §§ 3-4 ...............................................................17

Miss. Const. §§ 145-145B ...............................................................17

## INTRODUCTION

Defendants' motion to dismiss is entirely unmoored from vote dilution law. First, Defendants' conception of Article III standing is without legal basis, untethered from averred facts in Plaintiffs' Complaint, and would set an impossible standard for all future litigants in voting rights cases. If individual voters who are directly harmed by a state's election practice do not have standing to redress the harm created by vote dilution, then no one has standing to sue. If an organization, comprised primarily of registered Latino voters, which is committed to voter education and civic engagement, does not have standing, then no organization has standing to sue. Defendants' motion to dismiss for lack of standing should be denied.

Second, Defendants' argument that Plaintiffs failed to assert a viable Section 2 claim should also be rejected. In arguing that the Texas Supreme Court and Court of Criminal Appeals at-large elections are effectively not subject to the Voting Rights Act, Texas ignores the seminal Supreme Court decision, *Chisom v. Roemer*, 501 U.S. 380 (1991), which unequivocally established that appellate judicial elections are subject to vote dilution claims. In support of their argument, Defendants cite a string of inapposite cases related to state trial court elections, ignoring the clear and critical distinctions between trial and appellate court elections drawn by the courts in those cases. Texas's motion is without merit.

## STATEMENT OF FACTS AND OF THE CASE

Plaintiffs challenge the statewide, at-large method of electing Texas Supreme Court justices and Texas Court of Criminal Appeals judges, on the basis that this method unlawfully dilutes the votes of Latino Texans in violation of Section 2 of the Voting Rights Act. Pls.' First Am. Compl. (Dkt. 24) ("Compl.") ¶¶ 1-4. Latinos represent more than one-quarter of Texas's citizen voting age population, yet are deprived of equal opportunity to participate in the political process and to elect candidates of choice to these two courts. *Id.* The courts at issue are the final

authorities on questions of Texas civil and criminal law and issue decisions that greatly impact the State's Latino population. *Id.* ¶ 1. Because Texas's majority-white citizen voting age population tends to vote as a bloc to consistently defeat the candidates preferred by Latino voters, Latinos are rendered ineffective minorities in almost every election for both courts. *Id.* ¶ 1-4.

On October 4, 2016, Defendants filed their motion to dismiss Plaintiffs' amended complaint on the grounds that Plaintiffs lack standing and failed to state a claim under Section 2 of the Voting Rights Act.

## ARGUMENT

## I.   PLAINTIFFS HAVE ADEQUATELY PLEADED STANDING

The allegations in Plaintiffs' Complaint make clear that both the Individual Plaintiffs and LUPE have standing. Under the test established in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), standing is adequately pleaded where plaintiffs allege: (1) an "injury in fact" to the plaintiff; (2) a "causal connection between the injury and the conduct complained of"; and (3) a "likel[ihood] . . . that the injury will be redressed by a favorable decision." *Id.* at 560-61 (internal citations omitted). When reviewing the Complaint, the "allegations of injury are to be liberally construed." *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009). Indeed, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of [plaintiff]." *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975); *Little*, 575 F.3d at 536. Dismissal is appropriate "*only* if it appears certain that [plaintiffs] cannot prove any set of facts" that would entitle them to relief. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (emphasis added).  Plaintiffs' pleadings as to standing pass this test easily.

Defendants ignore the allegations in Plaintiffs' Complaint and instead proffer an unattainable and legally unsupported standard for standing in vote dilution cases. Under

Defendants' construction, there is no allegation specific enough and no injury personal enough to establish an individual voter's standing, and no organization could ever have standing, either representationally or in its own right. That is not the law.

A.    <u>The Individual Plaintiffs Have Standing</u>

Plaintiffs satisfy all three elements of the *Lujan* standing test: they suffered an injury caused by Defendants' conduct, which can be remedied under federal law. As set forth in detail in the Complaint, the Individual Plaintiffs are individual voters who are members of a protected class and whose votes have been diluted because of the at-large election system enforced by Defendants. Single-member districts are likely to remedy this injury.[1]

Ignoring these allegations, Defendants argue that "the lone factual contention" that Individual Plaintiffs are Latino voters residing in Nueces or El Paso counties "does nothing to satisfy Article III's standing requirements." Defs.' Br. at 11. But it is axiomatic that "voters who allege facts showing disadvantage to themselves as individuals" as a result of a state's election practices "have standing to sue." *Baker v. Carr*, 369 U.S. 186, 206-08 (1962) ("A citizen's right to vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution."); *see League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993) (en banc) (recognizing that individual voters have standing to challenge election practices); *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 430 (5th Cir. 2011) (holding that individual voter had standing to sue where he alleged "depriv[ation] of his pre-existing right to vote"). Moreover, as courts have repeatedly held, at-large electoral schemes such as those challenged in this case operate to injure

_____

[1] There are numerous other possible remedies to these violations, but it is unnecessary to plead them to meet the Plaintiffs' burden.

minority voters. *See Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) ("This Court has long recognized that multimember districts and at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'").

Individual Plaintiffs allege that they are registered voters and members of a protected class whose electoral strength is, and has been, submerged or deprived by the white majority in at-large, statewide elections for the Texas Supreme Court and the Texas Court of Criminal Appeals. Compl. ¶¶ 11-17, 26-27, 41, 45-46. Further, Individual Plaintiffs allege not only that they are registered to vote in Texas, but also that they are Latinos who live in areas that would comprise single-member districts, if the relief requested in the complaint is granted. *Id.* ¶¶ 43-44. Thus, the Individual Plaintiffs have alleged a "disadvantage to themselves as individuals" as a result of Texas' at-large election procedures for these multi-member courts.

Defendants also argue that Individual Plaintiffs were required to plead "that *they* have been unable to elect their candidates of choice to the Texas Supreme Court or Court of Criminal Appeals," their "preferred candidates—or whether those selections would be based on race or ethnicity," and that they "personally have suffered vote dilution because the challenged courts' members are elected statewide." Defs.' Br. at 11. This is wrong.

First, Defendants fail to cite any case that establishes that these allegations must be advanced at the pleading stage or are in any way relevant to standing.

More fundamentally, even if such allegations were required at this stage of the litigation (which they are not), Individual Plaintiffs met that burden here because "general allegations" are presumed to "embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal quotations omitted). The Individual Plaintiffs allege that they are Latinos or Latinas, registered voters, and residents of Texas, that they "are politically cohesive" and that the

"State's white citizen voting age majority votes sufficiently as a bloc to enable it usually to defeat the Latino voter's preferred candidates." Compl. ¶¶ 4, 11-17. Thus, as Plaintiffs allege, "the at-large method of electing judges to the high courts submerges Latino voters so that they are rendered ineffective electoral minorities in most every election for both courts." *Id*. ¶ 26. As a result of shutting Latinos out of the elections for these two courts, their concerns and viewpoints as a minority community are not represented. From these allegations it readily can be inferred that Individual Plaintiffs are unable to elect the candidate of their choosing based on the at-large election system. Compl. ¶ 58.

Defendants argue—with no basis—that the Individual Plaintiffs "presume that every Latino voter prefers the same candidate in every race." Defs.' Br. at 12. Plaintiffs do not presume this nor must they prove it. Plaintiffs must allege only that Latino voters vote as a bloc for a preferred candidate, and that the white majority votes as bloc for opposing candidates. *Thornburg*, 478 U.S. at 89-90. Plaintiffs have more than adequately pleaded these allegations. Compl. ¶¶ 4, 41, 45-46. Nor is there merit to Defendants' contention that, "[t]o conclude that the Individual Plaintiffs have shown a sufficient injury, therefore, the Court must infer that a voter's candidate preference is determined, in all instances, by the voter's ethnicity." Defs.' Br. at 12. This illogical syllogism mischaracterizes Plaintiffs' position and fundamentally misunderstands Section 2 law. The Plaintiffs, at this stage of the litigation, do not have to plead the specifics Defendants demand. Indeed, as to some of those specifics—such as "why" the Latino community prefers certain candidates or that "every Latino voter" always votes the same "in every race"—Plaintiffs need not ever prove these facts, let alone plead them in the Complaint. A Section 2 vote dilution claim does not require any showing that every member of the minority population must vote precisely the same way in every election.

Defendants further claim that the Individual Plaintiffs' allegations are insufficient because Plaintiffs "cannot establish they have suffered a legally cognizable injury by broadly contending that voters should be able to select members of the State's judiciary," citing *United States v. Hays*, 515 U.S. 737 (1995). Defs.' Br. at 11. But *Hays* is inapposite. In *Hays*, the Supreme Court held that the plaintiffs did not have standing to bring their claim because they did not reside in the districts at issue. *Hays*, 515 U.S. at 739 ("[A]ppellees do not live in the district that is the primary focus of their racial gerrymandering claim, and they have not otherwise demonstrated that they, personally, have been subjected to a racial classification. For that reason, we conclude that appellees lack standing to bring this lawsuit."). Here, Plaintiffs have plead that they live in Texas, which is the challenged district, and that they reside in the putative eight-member or nine-member proposed district plans. *Hays* thus has no relevance or application here.

Next, Defendants assert that the Individual Plaintiffs have not "suppl[ied] any facts that demonstrate they would be able to elect their candidates of choice in a single-member districting model." Defs.' Br. at 12. Not only is this false, but it is contrary to Fifth Circuit precedent. The standard by which Section 2 districts are evaluated in the Fifth Circuit is that a putative district must contain an affected minority population of at least 50 percent of the citizen age voting population. *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853 (5th Cir. 1999) (plaintiffs must prove that minority "constitute[s] more than 50% of the relevant population in their demonstration district"; "relevant population" is determined by "voting-age and citizenship"). Plaintiffs have alleged that "the Latino population and citizen voting age population are sufficiently numerous . . . to form a majority of the [relevant] population in at least two properly-apportioned single-member . . . plans." Compl. ¶ 43. Plaintiffs have also

alleged that Latino voters "are politically cohesive." *Id.* ¶ 45. These are "supplied facts" that would demonstrate the ability to elect the candidates of minority choice under a remedial plan.

Defendant's contention that "Plaintiffs cannot even say whether the new scheme should have eight or nine districts—let alone how those plans would personally affect each of them" likewise fails. Defs.' Br. at 13. But Plaintiffs have proposed two possible remedial schemes to demonstrate that Latino voters are sufficiently numerous as to be entitled to relief even if the Court determined that the Chief Justice and/or Presiding Judge should be treated differently than the other members of their respective courts. Rather than dooming the Plaintiffs' pleadings, it is demonstrative of the strength of the claim and the size and importance of the Latino electorate.

Finally, Defendants argue that "Plaintiffs cannot offer any objective standard for determining that a hypothetical single-member scheme likely would redress any injury that each individual has suffered due to the current system." Defs.' Br. at 13. This is wrong and ignores the thousands of pages of case law that offer guidance in identifying and redressing vote dilution. The seminal case of *Gingles* provides strict standards that offer guidelines not only for proving injury in vote dilution claims (i.e., the preconditions and the totality of circumstances tests), but also for redressing that injury. Plaintiffs pleaded the necessary preconditions to establish an injury, as well as the redressability for that injury. Compl. ¶¶ 42-58, 60-62.

### B.    LUPE Has Standing

LUPE has representational standing on behalf of its members. An organization may assert standing on behalf of its members if (1) the members have standing to sue in their own right, (2) the interests of the organization seeks to protect are germane to the organization's purpose, and (3) neither the claim nor the relief requires the participation of the each individual

plaintiff.[2] *Hunt v Washington*, 432 U.S. 333, 343 (1977). Despite Defendants' claims to the contrary, LUPE meets each and every one of these requirements.

### 1.    LUPE's members have standing.

Plaintiffs allege that "La Union Del Pueblo Entero, Inc. is a Texas nonprofit membership corporation . . . whose members are Texas registered voters. LUPE uses its resources to promote civic engagement, including voting." Compl. ¶ 10. Further, "LUPE has operated an office in San Juan, Hidalgo County, Texas for over ten years and also has office in the cities of Alton, Las Milpas, Mercedes, and Edcouch, Texas." *Id.*  LUPE's members are nearly all Latinos and Latino voters. These members and offices all reside in Texas, and LUPE has members that would very likely reside in both potential remedial districts. As discussed, Latino voters, including members of LUPE, are uniquely harmed by Texas's at-large election scheme for choosing its judges for its highest courts.  Thus, LUPE's members have standing.

### 2.    Challenging the judicial election system is germane to LUPE's purpose.

LUPE's mission includes promoting voting and helping its members to participate in American democracy. It expends resources educating its members on the importance of voting and the democratic process. The Court of Criminal Appeals and the Supreme Court of Texas render decisions that affect the lives of LUPE's members and Texas's Latino community "directly, particularly, and significantly." Compl. ¶ 58. To be sure, these courts affect all people in Texas. But they affect LUPE's members in a specific and injurious way. For example, LUPE's members' children go to school in an education system that is routinely adjudged by the Texas

---

[2] Plaintiffs need not plead organizational standing as associational standing alone is sufficient. *See Warth*, 422 U.S. 490, 511 (1975) ("[E]ven in the absence of injury to itself, an association may have standing solely as the representative of its members.").

Supreme Court. LUPE's members are also greatly impacted by the Court of Criminal Appeals, whose decisions include the sanctioning of race as a test of future dangerousness for criminal penalties. *Saldana v State*, 70 S.W.3d 873, 875 (Tex. Crim. App. 2002). Thus, contrary to Defendants' assertion, ensuring that these courts adequately represent and reflect the Latino community's interest is germane to LUPE's purpose of advocating for fair treatment of its members.

### 3. The Participation of LUPE's Members is not required.

Defendants claims that "LUPE does not demonstrate . . . that it can proceed in this suit without its members' participation." Defs.' Br. at 15. Defendants ignore that for decades, voting rights and community organizations have prosecuted Section 2 suits, and that all have done so under organizational or associational standing. *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006); *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012); *League of United Latin Am. Citizens #4552 v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843 (5th Cir. 1997); *N.A.A.C.P. v. Fordice*, 105 F.3d 655 (5th Cir. 1996); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109 (5th Cir. 1991); *League of United Latin Am. Citizens, Council No. 4386 v. Midland Ind. Sch. Dist.*, 829 F.2d 546 (5th Cir. 1987). The relief requested here is prospective and applicable to all voters whose rights have been injured by Texas's at-large voter system for electing its justices to the Supreme Court and Court of Criminal Appeals. Therefore, the participation of individual members of LUPE is not necessary to obtain relief.

## II. THE COMPLAINT STATES A *PRIMA FACIE* CASE UNDER SECTION 2 OF THE VOTING RIGHTS ACT

Defendants claim that Plaintiffs fail to state a vote dilution claim under Section 2, but that argument is wrong as a matter of law, and is premised on disregard of both the facts as alleged in

Plaintiffs' Complaint and the standard of review applicable to a motion to dismiss. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *See generally Bell Atlantic Corp. v. Twombley*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice at the pleading state, *Iqbal*, 556 U.S. at 678, a court considering a motion to dismiss must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (internal quotations omitted). For that reason, motions to dismiss under Rule 12(b)(6) are generally viewed with disfavor and are rarely granted. *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).

## A.    Plaintiffs' Complaint Pleads Sufficient Facts that Support the Claim for Relief

Vote dilution cases have two phases: the three preconditions set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and, if plaintiffs satisfy the preconditions, the totality of circumstances balancing test. *Johnson v. De Grandy*, 512 U.S. 997 (1994). The three *Gingles* preconditions are: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51. In addition, plaintiffs must allege that "under the totality of the circumstances" the election practice "result[s] in unequal access to the electoral process." *Id.* at 46. Plaintiffs properly allege each of these requirements.

Plaintiffs' Complaint alleges that the Latino population and citizen voting age population is "sufficiently large and geographically compact" to constitute a majority in at least two single-member districts in nine or eight-district plans. Compl. ¶¶ 28-31, 43-44. It also alleges that

Latino voters are politically cohesive and that white bloc voting consistently defeats the Latino population's judges of choice. *Id.* ¶¶ 32-41, 45-46. The Complaint also sufficiently pleads that the totality of the circumstances is balanced in favor of liability, including Texas's historic and current discrimination touching on the right to vote; the presence of racially polarized voting; the use of mechanisms, including numbered posts and a statewide electoral district, that enhance the opportunity for discrimination against Latinos; the extent to which Latinos bear the effects of discrimination that has resulted in lower levels of voter participation; and the extent to which Latinos are underrepresented among elected officials in the State. *Id.* ¶¶ 47-58. In short, Plaintiffs have asserted a plausible claim that the method of electing judges to Texas's two highest courts violates Section 2 of the Voting Rights Act.

### B.    Appellate Judicial Elections Must Comply with the Voting Rights Act

Defendants argue that Plaintiffs' suit "finds no support in the Voting Rights Act" and should be dismissed because the Act supposedly does not apply in any meaningful way to judicial elections. Defs.' Br. at 19. Essentially Defendants argue that Texas may operate its discriminatory judicial election system, violative of federal law, because that system is enshrined in the Texas Constitution, and the proposed remedy is inconsistent with those provisions of the Texas Constitution. *See* Defs.' Br. at 19-23, 30-32. Defendants ignore that their argument has already been rejected by our highest court. The Supreme Court has unequivocally held that appellate judicial elections are fully subject to vote dilution claims under Section 2 of the Voting Rights Act, even where those elections are provided for in the state's constitution and the proposed remedy would contravene existing state law. *Chisom v. Roemer*, 501 U.S. 380 (1991).

In *Chisom*, plaintiffs challenged a multi-member Louisiana Supreme Court district, alleging that it unlawfully diluted African American voting strength in violation of Section 2. *Id.* at 384-85. The Fifth Circuit found that Section 2 did not apply to judicial elections because

judges are not "representatives" under the Act. *Id.* at 396-402. In rejecting that narrow definition of "representatives," the Supreme Court concluded that the VRA "should be interpreted in a manner that provides the 'broadest possible scope' in combating racial discrimination" and that congressional intent was not to withdraw "an important category of elections"—that is judicial elections—from the protections of the statute.[3] *Id.* at 403-4 (*quoting Allen v. State Board of Elections*, 393 U.S. 544, 567 (1969)). The Court made clear that the State's decision to elect judges rather than appoint them is "*precisely* the reason[]" that Section 2 is applicable. *Id.* at 401 (emphasis added). As the Court explained, "ideally public opinion should be irrelevant to the judge's role," but where judges are forced to run for office and garner public support, there is a "fundamental tension between the ideal character of the judicial office and the real world of electoral politics." *Id.* at 400-01. Thus, because elected judges "vie for popular support just as other political candidates do," the Court held that they are "representatives" under the Act alongside all other elected officials. *Id.* at 400.[4] Defendants' argument ignores *Chisom* and stands the Supremacy Clause on its head. *See Shambaugh v. Scofield*, 132 F.2d 345, 346 (5th Cir. 1943) (federal statutes "are the supreme law of the land [and if] they are in conflict with State

---

[3] The Supreme Court also rejected the Fifth Circuit's holding that Section 2 "provides two distinct types of protections for minority voters" in judicial elections - a prohibition on standards, practices, and procedures that have a disparate impact on minority voters' opportunity to participate in the political process, but outright permission to engage in practices that affect minority' voters opportunity to elect judges of their choice. The Court called the attempt to bifurcate the statute in such a manner "radical surgery," and characterized the opportunity to participate in the political process and the opportunity to elect representatives of choice as "inextricably linked." *Id.* at 396-98.

[4] The Court also noted a multitude of other similarities between elected judges and other elected officials. It highlighted its prior recognition that judges, like legislators and executive officers, "engage in policymaking at some level" because judges exercise discretion on issues of public importance and bring to their jobs "a well-considered judgment of what is best for the community." *Chisom*, 501 U.S. at 399 at n.27 (internal quotations omitted). Elected judges also "financ[e] a campaign, solicit[] votes, and attempt[] to establish charisma or name identification" just as other elected officials do. *Chisom*, 501 U.S. at 401 n.29.

law, constitutional or statutory, the latter must yield"); *United States v. Leach*, 639 F.3d 769, 772 (7th Cir. 2011) ("[t]he Supremacy Clause establishes that state constitutional provisions cannot override federal statutes").

### C. Defendants Improperly Rely on Inapposite Case Law to Argue that Any Remedy Here is Prohibited

Operating on the assumption that single-member districts are the only possible remedy in this case, Defendants argue that the Court is prohibited from creating such districts. In so doing, Defendants rely on a number of Eleventh Circuit cases that are the progeny of *Houston Lawyers' Association v. Attorney General of Texas*, 501 U.S. 419 (1991). Defs.' Br. at 21-26. Defendants argue that these cases stand for the proposition that any vote dilution in the judicial context cannot be remedied by the creation of single-member districts. *Id.* In particular, Defendants claim that adoption of these districts would "flout[] the State's substantial interest in maintaining a link between a judge's territorial jurisdiction and the area in which the judge's electoral base resides." Defs.' Br. at 23. But *Houston Lawyers' Association* and its progeny concern the applicability of vote dilution claims to the election of *trial* judges. Those cases have nothing to do with whether the Texas's at-large, statewide *appellate* judicial elections violate the Voting Rights Act.

In *Houston Lawyers'*, the Court considered a challenge by Latino organizations and individuals to the at-large method of electing Texas district court judges. 501 U.S. 419 (1991). The Court reiterated *Chisom*'s holding that the VRA applies to judicial elections, but wrote separately to establish that it *also* applies to trial judges. *Id.* at 426 ("If a State decides to elect its

*trial* judges, as Texas did in 1861, those elections must be conducted in compliance with the Voting Rights Act.") (emphasis added).[5]

However, only in *Houston Lawyers'* did the Supreme Court acknowledge a state's "linkage interest." As the Court explained, when considering the "totality of circumstances" in determining whether a Section 2 violation has occurred, the state's interest in "maintaining the link between a *district* judge's jurisdiction and the area of residency of his or her voters is a legitimate factor to be considered by courts." *Id.* at 426 (emphasis added). But as relevant here, the Court made it clear that this interest applies only when trial judges are at issue. *Id.* The reasoning behind the distinction is obvious: trial court judges have the ability to act unilaterally in favor of one party or another, thus raising the specter of "home-cooked" decision-making, but the same is not true of deliberative, collegial bodies where the appellate judge has but one vote as to the ultimate outcome.

Critically, *all* of the cases primarily relied on by Defendants involve challenges to the election of trial judges, not panels of appellate judges. *Cousin v. Sundquist*, 145 F.3d 1414 (6th Cir. 1998); *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994); *S. Christian Leadership Conf. of Ala. v. Sessions*, 56 F.3d 1281 (11th Cir. 1995); *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998); *Clements*, 999 F.2d 831. Consistent with the Supreme Court's holding in *Houston Lawyers'*, the Fifth Circuit has itself acknowledged that appellate judges are distinct from trial judges and that the interest in linking jurisdictional and electoral bases is either inapplicable or significantly diminished when appellate judges are at issue. In *Clements*, a Section 2 challenge to the at-large method of electing Texas trial court judges, the Fifth Circuit noted that, "[u]nlike legislators or even appellate judges, who make decisions in groups, each district judge holds a single-member

---

[5] In fact, *Houston Lawyers'* was decided on the very same day as *Chisom*.

office and acts alone. When collegial bodies are involved, all citizens continue to elect at least one person involved in making a particular decision." 999 F.2d at 873.[6] In fact, while the *Clements* court expressed concerns over an altered electoral method for trial judges, it recognized the attributes of a district-based method for collegial bodies: "[S]ubdistricting for multimember offices can enhance minority influence because members from minority subdistricts participate in and influence all of the decisions of the larger body . . . ." *Id.*

Furthermore, even as to vote dilution cases involving trial judges, the Supreme Court in *Houston Lawyers'* also stressed that the "linkage" interest is far from dispositive: "Because the State's interest in maintaining an at-large, district wide electoral scheme for single-member offices is merely one factor to be considered in evaluation the 'totality of the circumstances,' that interest does not automatically, and in every case, outweigh proof of racial vote dilution." *Id.* at 427. It is not surprising, then, that every one of the cases relied upon by Defendants on this point were decided after a full bench trial considering such proof.[7] Contrary to Defendants' assertions, the State's linkage interest presents no bar to a possible sub-districting remedy. It is for this Court to decide, after the presentation of evidence, whether such a remedy is necessary to address Plaintiffs' injury.

---

[6] This is also consistent with the holdings of the Eleventh Circuit (from which most of the cases cited by Defendants originate), which recognize the distinct nature of appellate judges in the context of Section 2 claims, and acknowledge that its strict view of the linkage interest in trial judge vote dilution cases may conflict with *Chisom* and *Houston Lawyers'*. *See Nipper*, 39 F.3d at 1535 n.78 (noting distinction between "the election of trial court judges" and "members of a multimember appellate court"); *Davis v. Chiles*, 139 F.3d at 1424 (inviting *en banc* review to rectify "what now seems, in hindsight, to be an insurmountable weight on a state's interest in preserving its constitution's judicial selection system and in maintaining linkage between its judges' jurisdictions and electoral bases . . . . We recognize that this doctrinal development appears to conflict with the Supreme Court's initial pronouncements on this subject in *Chisom* and *Houston Lawyers'*.").

[7] *See Cousin*, 145 F.3d 1414; *Nipper*, 39 F.3d 1494; *S. Christian Leadership Conf. of Ala*, 56 F.3d 1281; *Davis*, 139 F.3d 1414; *Clements*, 999 F.2d 831.

### D. Defendants Bear the Burden of Demonstrating that Partisan Politics, and not Race, Best Explains Patterns of Racially Polarized Voting

Defendants also wrongly assert that "Plaintiffs' vote dilution claim fails as a matter of law because they do not allege that voting in elections to the Texas Supreme Court or the Court of Criminal Appeals is motivated by racial concerns as opposed to partisan preference." Defs.' Br. at 18. But there is no requirement that a plaintiff plead such facts in a Section 2 case. As the Fifth Circuit has made clear, proof that partisanship, rather than racial concerns, affects voting patterns is a *defense* that may be raised by a defendants; it is not an element of a Section 2 claim:

> [T]he district court err[ed] by placing the burden on plaintiffs to disprove that factors other than race affect voting patterns . . . Plaintiffs are to present evidence of racial bias operating in the electoral system by proving up the *Gingles* factors. Defendants may then rebut the plaintiffs' evidence by showing that no such bias exists in the relevant voting community. The district court betrays its misunderstanding of this burden-shifting when it concludes that 'factors other than race influence voters in Attala County, and therefore, plaintiff has failed to prove racial polarization' on the basis of there being 'no proof in the record that in any way compares the candidates on any basis other than race.' Such a showing is for the defendants to make.

*Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 290 (5th Cir. 1996). In accord with *Gingles*, Plaintiffs pleaded that Latino Texans are politically cohesive and that the State's white citizen voting age population majority votes sufficiently as a bloc to defeat Latino candidates of choice for the courts at issue. 478 U.S. at 50-51; Compl. ¶¶ 4, 41, 45, 46. Nothing further is required at this stage.

### E. Defendants' Arguments Concerning Judicially Manageable Standards Were Expressly Rejected in *Chisom*

Defendants also argue that Plaintiffs' suit should be dismissed because there are no objective, manageable standards that the Court can use to fashion a remedy.[8] Defs.' Br. at 26-28.

---

[8] Despite Defendants' speculation, Plaintiffs do not challenge the size of the courts at issue. *See* Defs.' Br. at 27.

Defendants largely rely on *Wells v. Edwards*, 409 U.S. 1095 (1973), to advance this argument, where the Supreme Court affirmed a three-judge panel's decision that judicial election districts are not subject to the one-person, one-vote rule of rough population equality. *See* Defs.' Br. at 27. But *Chisom* squarely addressed this issue and is again dispositive:

> [B]oth respondents and the *LULAC* majority suggest that no judicially manageable standards for deciding vote dilution claims can be fashioned unless the standard is based on the one-person one-vote principle. They reason that, because we have held the one-person, one-vote rule inapplicable to judicial elections, it follows that judicial elections are entirely immune from vote dilution claims. The conclusion, however does not follow from the premise . . . . The [VRA] was enacted to protect voting rights that are not adequately protected by the Constitution itself.

*Chisom*, 501 U.S. at 402-03 (internal citations omitted).[9] Indeed, just because Texas is not *required* to comply with the one-person, one-vote principle when drawing judicial districts, does not mean that the State is not required to comply with the Voting Rights Act. That the Court in *Chisom* did not prescribe a specific remedy leaves Defendants to wrongly conclude that *no* remedy can be fashioned.[10] This Court should again decline Defendants' invitation to declare *Chisom* meaningless.

## F. Defendants' Remaining Arguments are Without Merit

Defendants' other arguments should be given short shrift. Defendants misread Section 2(b) of the Voting Rights Act and accuse Plaintiffs of attempting to create a prohibited system of proportional representation. Defs.' Br. at 29. But the statute, which provides that "nothing in this

---

[9] *See also id.* at 403 n. 32 ("We note . . . that an analysis of the proper statutory standard under § 2 need not rely on the one-person, one-vote constitutional rule. *See Thornburg v. Gingles*, 478 U.S. at 88-89 (O'Connor, J., concurring in judgment); *see also White v. Regester*, 412 U.S. 755 (1973) (holding that multimember districts were invalid, notwithstanding compliance with the one-person, one-vote rule)").

[10] Texas stands alone as the only Fifth Circuit state to elect its high court judges at-large. Mississippi has nine Supreme Court justices, with three elected from each of three districts. Miss. Const. §§ 145-145B. Louisiana has seven Supreme Court justices, each of whom is elected from a single-member district. La. Const. art. V §§ 3-4.

section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population," establishes that there is no right for minority *candidates* to be elected proportionally. *See* 52 U.S.C. § 10301(b); *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994). Defendants' argument applies equally to *all* vote dilution cases, has been rejected, and is without merit.

Finally, Defendants argue that the potential remedial districts here constitute unlawful "race-based redistricting," but do so in the absence of any remedial plan from which they might assert that such redistricting exists. Defs.' Br. at 29-30. It is the subordination of traditional districting principles to racial considerations that the Court has subjected to strict scrutiny. *See Miller v. Alabama*, 515 U.S. 900, 917 (1995). The mere setting of a racial target is not, in and of itself, unconstitutional, and indeed, the first *Gingles* precondition requires that plaintiffs demonstrate that at least majority-minority can be drawn, *see supra*, and the remedies in Section 2 cases typically involve the intentional creation of majority-minority districts.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss the Complaint.

Dated: October 28, 2016        Respectfully submitted,

By:    /s/ Lindsey B. Cohan
     Amy L. Rudd
     Lindsey B. Cohan
     S.D. Texas Bar No. 2319985
     Dechert LLP
     500 W. 6th Street, Suite 2010
     Austin, Texas 78701
     Telephone: (512) 394-3000
     Facsimile: (512) 394-3001
     lindsey.cohan@dechert.com

     Jose Garza
     Martin Golando
     Michael P. Moran
     Rolando L. Rios
     Joaquin G. Avila
     Garza Golando Moran, PLLC
     115 E. Travis St., Ste. 1235
     San Antonio, Texas 78205

     Jon Greenbaum, Esq. (*pro hac vice*)
     Ezra D. Rosenberg, Esq. (*pro hac vice*)
     Brendan Downes, Esq. (*pro hac vice*)
     Lawyers' Committee for Civil Rights Under Law
     1401 New York Ave., NW, Suite 400
     Washington, D.C. 20005

     Neil Steiner, Esq. (*pro hac vice*)
     Dechert LLP
     1095 Avenue of the Americas
     New York, New York 10036-6797

     *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2016, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ Lindsey B. Cohan
Lindsey B. Cohan
Dechert LLP
300 W. 6th Street, Suite 2010
Austin, Texas 78731
lindsey.cohan@dechert.com
