United States District Court
Southern District of Texas
**ENTERED**
April 03, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LIONEL  LOPEZ, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:16-CV-303 |
| | § | |
| GREG  ABBOTT, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER ON MOTION TO DISMISS</u>

Plaintiffs challenge the at-large election of judges serving on the State of Texas's courts of last resort—the Supreme Court of Texas and Texas Court of Criminal Appeals—on the basis of vote dilution under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  D.E. 24.  Before the Court is Defendants' Motion to Dismiss (D.E. 30), challenging Plaintiffs' standing and whether they have adequately alleged a Section 2 claim.  For the reasons set out below, the motion is DENIED.

## DISCUSSION

Defendants, the State of Texas; Greg Abbott, in his official capacity as Governor of Texas; and Carlos Cascos, in his official capacity as Texas Secretary of State, challenge the Court's jurisdiction under Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiffs do not have standing to assert their claims.  Also, invoking Rule 12(b)(6), Defendants challenge whether Plaintiffs have properly pled the necessary elements of their Voting Rights Act claim.  Each challenge is addressed in turn.

### A. Standing to Support Jurisdiction

#### 1. Standard of Review

Federal Rule of Civil Procedure 12(b)(1) requires dismissal for lack of subject matter jurisdiction if the Court lacks statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). Standing determines the court's fundamental power to hear the suit. *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 386 (5th Cir.2002). When a Rule 12(b)(1) motion is filed together with other Rule 12 motions, the court should address the jurisdictional attack before addressing any attack on the merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir.2001), *cert. denied sub nom.*, *Cloud v. United States*, 536 U.S. 960 (2002).

The burden of proof is on the party asserting jurisdiction—Plaintiffs, here. *Ramming*, 281 F.3d at 161. The elements of Article III standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case [and] each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Thus, at the pleading stage, a complaint must contain general factual allegations to indicate that standing is plausible. *See id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must assume arguendo the merits of the legal claim. *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) (citing *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) (in turn citing *Warth v. Seldin*, 422 U.S. 490, 501–02 (1975)).

### 2.  Defendants' Challenges to Standing

To establish standing, it is well-settled that the plaintiff must allege the following elements: (1) the plaintiff suffered an injury in fact, which is concrete or particularized and actual or imminent; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560-61.  Defendants contend that Plaintiffs' pleading suffers defects on each of these elements.

**Injury**.  Defendants claim that a single plaintiff's standing cannot be predicated upon a generalized grievance shared by all or a large class of citizens.  For this proposition, they cite *Warth, supra* at 499.  However, the *Warth* case did not address voting rights or any other injury necessarily shared by all or a large class of citizens.  Rather, the claimed injury was a zoning ordinance that excluded certain low income persons from housing.  The *Warth* plaintiffs did not demonstrate that they had been excluded from housing.  Instead, they claimed that, because of shared racial or ethnic minority and low income demographics, they could challenge the ordinance on equal protection grounds.  Because they had not demonstrated that they were within the class that had actually been injured, they did not have standing.

At-large voting schemes have been held to impair minority voting rights.  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).  Thus, individual citizens of the affected minority in the relevant jurisdictions have the necessary injury to satisfy the requirements of standing to challenge a practice allegedly causing dilution of their vote.  *E.g., Kirksey*

*v. Bd. of Sup'rs of Hinds Cty.*, 402 F. Supp. 658, 675 (S.D. Miss. 1975), *rev'd on other grounds*, 554 F.2d 139 (5th Cir. 1977).

> If such impairment does produce a legally cognizable injury, they are among those who have sustained it.  They are asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' not merely a claim of 'the right possessed by every citizen 'to require that the government be administered according to law . . . '.'  They are entitled to a hearing and to the District Court's decision on their claims.  'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.'

*Baker v. Carr*, 369 U.S. 186, 208 (1962) (citations omitted) (addressing an equal protection challenge to apportionment).  *See also*, *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999).

Defendants further suggest that the individual injury of vote dilution is not adequately pled unless the Individual Plaintiffs state a scenario in which their own or their Latino group's preferred, named, candidate was not elected.  However, the first amended complaint recites a statistical history of voting for the high courts of Texas and alleges that Latino candidates and other candidates preferred by the Latino community have not been elected in numbers proportionate to the voting class.  D.E. 24, pp. 6-8.  They have placed the immediate past history of election outcomes in question and further development of the issues requires discovery and the presentation of evidence.  The pleading sets out a sufficient factual basis to defeat a Rule 12 motion.

**Cause**.  Defendants also claim that the necessary causal connection cannot be demonstrated because Plaintiffs cannot rule out the significance of independent reasons

for electoral defeat, such as party affiliation.  Defendants argue that Plaintiffs have to be able to show that the candidate they voted for did not prevail and that there were no other forces at work that might have caused the minority-preferred candidate to lose the election, citing *League of United Latin American Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993).  However, the *Clements* opinion discusses alternate causes as revealed through evidence at trial.  The opinion does not support pre-litigating such a fact issue in a motion to dismiss at the pleading stage.[1]

 Defendants also cite *United States v. Hays*, 515 U.S. 737, 745-46 (1995).  Likewise, that opinion was based on a fully developed trial record.  The Court wrote, "But appellees do not live in the district that is the primary focus of their racial gerrymandering claim, and they have not otherwise demonstrated that they, personally, have been subjected to a racial classification.  For that reason, we conclude that appellees lack standing to bring this lawsuit."  *Id*. at 739.  The relevant point to glean from this decision, then, is that individuals who do reside in the district that is the primary focus of their claim do have standing to complain of vote dilution.

Defendants also cite *Bennett v. Spear*, 520 U.S. 154, 167 (1997), as requiring proof that vote dilution was the exclusive cause of electoral defeat.  However, the causation requirement for standing is that "the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id*.  Allegations that their vote dilution results from the

---

[1]   This argument also reverses the burden of proof on a vote dilution claim, as discussed below with respect to the Rule 12(b)(6) portion of the motion.

method of conducting elections by the governing jurisdiction is sufficient.  Plaintiffs need not expressly exclude other potential causes of their injury.  At the pleading stage, the Court takes Plaintiffs' allegations as true.  If a party not before the Court is the source of the injury, Defendants must point that out with specificity.  They have not done so and the Court will not infer an alternate cause contrary to Plaintiffs' pleading.

**Remedy**.  Last, Defendants contend that Plaintiffs failed to adequately allege that their claimed remedy would likely redress their complaint.  *Lujan*, 504 U.S. at 561.  More specifically, Defendants argue that Plaintiffs' suggested remedy is too indefinite and that Plaintiffs fail to show that either of their single-member district alternatives would benefit them.  However, in their reply, Defendants admit that single-member districts do improve the chance of a voter electing his preferred candidate.  D.E. 41, p. 3.

Whether or not Plaintiffs can prevail, single-member districts are often the remedy of choice sought in vote dilution cases arising from at-large election systems.  *See e.g.*, *Milwaukee Branch of the NAACP v. Thompson*, 116 F.3d 1194 (7th Cir. 1997); *Southern Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281 (11th Cir. 1995) (en banc).  Plaintiffs have adequately alleged a remedy that will, if imposed, redress their injury.  This remedy may be one of several potential remedies.  There is nothing in the standing requirements that dictates that Plaintiffs must plead the remedy most likely to prevail or eliminate the potential that another remedy may be adopted as the case progresses.

### 3.  Plaintiffs Have Standing

Seven individuals join as Plaintiffs in this case:  Lionel Lopez, Isabel Raiza, Arlene Lira Easter, Alicia Benavidez, Andres Rosas, Lena Lorraine Lozano Solis, and Carmen Rodriguez.  D.E. 24.  Each Individual Plaintiff pleads that he or she is an adult citizen of the United States and is a Latino or Latina.  The first six are residents and registered voters in Nueces County, Texas.  The last is a resident and registered voter in El Paso County, Texas.  The Individual Plaintiffs have alleged sufficient facts to support their standing to proceed on their claims.

La Union Del Pueblo Entero, Inc. (LUPE) is a nonprofit membership corporation whose members are Texas registered voters who are nearly all Latinos.  Such corporations can maintain standing in two ways:  organizational standing and representational or associational standing.  *See generally, N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 237-39 (5th Cir. 2010).  LUPE asserts only representational standing in this case.  Such standing requires that (1) the members have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to its purpose; and (3) the direct participation of the members is not necessary to establish the claim or determine the relief.  *Hunt v. Washington*, 432 U.S. 333, 343 (1977).

Contrary to Defendants' argument, LUPE has alleged facts regarding each criterion.  Its members include Latino registered voters who reside in south and west Texas and would have individual standing as set out above.  Its organizational purposes include promoting voting and participation in the American democratic process.  It is further concerned with the election of the state's highest-ranking members of the

judiciary because they determine questions that directly affect LUPE members' lives, such as regulating the education system and adjudicating criminal cases in which race and ethnicity are prevalent issues.

Contrary to Defendants' argument, LUPE does not have to establish that ***each*** of its members can satisfy the standing requirements in their own right.  Rather, "The association must allege that its members, ***or any one of them***, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."  *Hunt*, 432 U.S. at 342 (emphasis added).  LUPE has made that allegation.

Last, the Court notes that such organizations have historically litigated voting rights cases for the benefit of minority populations in general, without necessity of individual participation.  *See e.g.*, *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012); *NAACP v. Fordice*, 105 F.3d 655 (5th Cir. 1996); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109 (5th Cir. 1991).  Plaintiffs have standing to proceed on their claims under the Voting Rights Act.

## B. Adequacy of Pleading of Voting Rights Act Claim

### 1. Standard of Review

The test of pleadings under Rule 12(b)(6) is devised to balance a party's right to redress against the interests of all parties and the court in minimizing expenditure of time, money, and resources devoted to meritless claims.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Furthermore,

"Pleadings must be construed so as to do justice."  Fed. R. Civ. P. 8(e).  The requirement that the pleader show that he is entitled to relief requires "more than labels and conclusions[;] a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Factual allegations are required, sufficient to raise the entitlement to relief above the level of mere speculation.  *Twombly*, 550 U.S. at 555.  Those factual allegations must then be taken as true, even if doubtful.  *Id*.  In other words, the pleader must make allegations that take the claim from conclusory to factual and beyond possible to plausible.  *Id*., 550 U.S. at 557.  The *Twombly* court stated, "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 570.

The Supreme Court, elaborating on *Twombly*, stated, "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.  In dismissing the claim in *Iqbal*, the Court stated, "It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."  556 U.S. at 681.

## 2.  Section 2 and the *Gingles* Framework

This Section 2 vote dilution claim alleges violation of the following provisions of the Voting Rights Act:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results in a denial or abridgement* of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title [prohibiting the application of any prerequisite based on status as belonging to a language minority group], as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the *totality of circumstances*, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:  *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301 (emphasis added).   Through case law, a two-part framework for evaluating Section 2 claims has emerged.  *See Gingles*, 478 U.S. at 48-51, 79-80.

The first part requires establishing three preconditions.  The Fifth Circuit treats each as a bright-line test that must be passed before the claim proceeds.  *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852 (5th Cir. 1999).  Those *Gingles* preconditions are: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a proposed single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it to routinely defeat the minority's preferred candidate.  After establishing those elements, the inquiry goes to the second stage.

The second part of the *Gingles* framework involves an evaluation of the totality of the circumstances to show that the minority group does not have an equal opportunity to participate in the political process and elect representatives of their choice. The Senate set out a non-exhaustive list of seven (7) factors that inform the evaluation of the totality of the circumstances. *Gingles*, 478 U.S. at 45 (quoting from S. Rep. 97-417, p. 30). Included in the totality of the circumstances test are the following issues:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

[8.]   Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; [and]

[9.]   Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id*. 478 U.S. at 36-37 (quoting from S. Rep. No. 97-417's at pp. 28-29).  "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  *Id*., 478 U.S. at 45.

### a.  Part One of the *Gingles* Framework

**Large and Compact Minority Group**.  Plaintiffs allege that the United States Census's 2008-2012 American Community Survey shows that Latinos represent 26.5% of Texas's citizen voting age population.  D.E. 24, pp. 1, 6-7.  In comparison, Texas's white citizen voting age population was 56.4% of the total.  *Id*. at 7.  The Latino population is also alleged to be concentrated in south Texas (south of San Antonio) and west Texas (west of the Pecos River).  Plaintiffs claim that this demonstrates that the Latino electorate is sufficiently large and compact to constitute a majority in two of eight or nine hypothetical properly-apportioned single-member districts.  Defendants do not challenge this, the first *Gingles* precondition.  D.E. 30, p. 19 n.6.

**Politically Cohesive Minority and White Bloc Voting**.  Plaintiffs claim that the voting behavior of the Latino population demonstrates that it is politically cohesive as a single minority group.  D.E. 24, pp. 8-9.  A statistical analysis of elections allegedly

supports the conclusion that Latinos vote overwhelmingly for certain preferred candidates, which candidates are ultimately defeated by white bloc voting. *Id*. Despite the size of the Latino voting population and the number of Latino candidates, the justices and judges elected to serve in the two high courts have been predominately white.

Plaintiffs allege that the only Latino judges who served those courts did so only after first being appointed by the Governor and that those particular Latino judges were not necessarily the preferred candidates of the Latino voters. D.E. 24, pp. 7-8. The Latino judges that have been elected were unopposed in their primaries and faced no major party candidate in the general election or were not the candidates preferred by Latino voters. Thus, they claim, white bloc voting has repeatedly defeated Latino-preferred candidates. These allegations are based on an analysis of the actual judicial elections and the race identity of the respective candidates.

Defendants challenge these second and third *Gingles* preconditions by stating that the pleading is inadequate to show legally significant racially polarized voting. *See generally, Nipper v. Smith*, 39 F.3d 1494, 1524, 1530 (11th Cir. 1994) (en banc). The argument is that Plaintiffs have failed to rule out other, non-racial factors, which may explain voting patterns. However, as illustrated by the *Nipper* opinion and confirmed by the Fifth Circuit, the influence of non-racial factors is a matter on which Defendants have the burden of proof. Defendants may show evidence of those other factors to rebut Plaintiffs' claims. *Teague v. Attala Cty., Miss.*, 92 F.3d 283, 290 (5th Cir. 1996) (citing *Nipper*, 39 F.3d at 1524). Consequently, there is no defect in pleading here, where Plaintiffs allege that racial factors govern the voting patterns.

### b.  Part Two of the *Gingles* Framework

Of the nine identified factors affecting the evaluation of the totality of the circumstances, Plaintiffs have clearly pled that seven support their claim (numbers 1, 2, 3, 5, 6, 7, and 8).  Defendants do not challenge this part of the pleading of the case under the *Gingles* analysis.  D.E. 30, p. 19 n.6.  The Court concludes that Plaintiffs have adequately pled a claim to relief under both parts of the *Gingles* framework.

### C.  Legal Impediments to the Prosecution of the Claim

Even if some allegations support a claim, if other allegations negate the claim on its face, or if the law prevents the claim, then the pleading does not survive the 12(b)(6) review.  *See generally, Jones v. Bock*, 549 U.S. 199, 215 (2007) (allowing dismissal at the pleading stage where allegations on their face showed that limitations barred the claim).  Defendants argue that Plaintiffs' action must be dismissed because it proposes a remedy that is an affront to Texas sovereignty and the Texas Constitution's provisions regarding the structure of its government.  But the Supreme Court has already held that Section 2 of the Voting Rights Act applies to state judicial elections.  *Chisom v. Roemer*, 501 U.S. 380, 384, 404 (1991).  *See also*, *Clements*, 999 F.2d 831; *SCLC v. Sessions*, 56 F.3d 1281; *Nipper*, 39 F.3d 1494.

Defendants also complain that the federal courts do not have the power to interfere with state choices regarding self-governance, relying heavily on the important principle of linkage:  that the scope of the electing constituency match the scope of the elected official's jurisdiction.  Linkage is one aspect of at-large elections that, repeatedly, has been held to constitute a legitimate and important state interest.  *E.g.*, *Mallory v. Ohio*,

173 F.3d 377 (6th Cir. 1999); *Milwaukee Branch of the NAACP*, 116 F.3d at 1194.  It serves the interest of judicial effectiveness, balancing accountability and judicial independence.  *Clements*, 999 F.2d at 868.  It also "diminishes the semblance of bias and favoritism towards the parochial interests of a narrow constituency."  *Id*. at 869.

The Fifth Circuit has recognized that, while weighty—particularly with respect to the operation of trial courts—Texas's interest in linkage does not defeat liability for voting rights claims in every case.  *Id*. at 870 (citing *Houston Lawyers' Ass'n v. Attorney Gen. of Texas*, 501 U.S. 419, 426-27 (1991)).  But it is "an essential part of the structure of the judicial office, much more than the method of electing the office holder."  *Clements, supra* at 876.  And remedies that interfere with linkage and impose structures guided by racial criteria have the potential to perpetuate certain aspects of discrimination and be self-defeating.  *See generally, Clements*, 999 F.2d at 872-74.

Despite the obstacles Plaintiffs may face, Defendants' issues are not dispositive at the pleading stage.  Defendants rely heavily on *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998), suggesting that it held that Plaintiffs' remedy of subdistricting a state-wide, at-large election was prohibited.  To the contrary, the Eleventh Circuit concluded—based on evidence developed in a bench trial—that "Florida's interests in maintaining its Constitution's judicial election model and preserving linkage between its judges' jurisdictions and electoral bases, considered together, ***outweigh*** Davis's interest in the adoption of her proposed remedy."  *Id*. at 1426 (emphasis added).  Likewise, the determination of the significant weight of Texas's interests in maintaining its constitutional methods for electing its judges was treated as a question of law in

*Clements*.  999 F.2d at 871-75.  But that weight was to be balanced against the evidence of vote dilution and the efficacy of any proposed mechanism for redressing that injury. *Id*. at 876.

In sum, Plaintiffs have pled the necessary elements for the imposition of a remedy. They have further suggested one plausible remedy.  It is not the task of this Court to determine at this juncture whether that remedy should be imposed, contrasted with any other remedy that may arise or no remedy at all.  Those are all questions to be considered upon the evidence proferred in this case.  For the purposes of this motion, Plaintiffs have adequately pled their standing and their claims and the motion to dismiss is DENIED.

Defendants' request that this order be certified for interlocutory appeal (D.E. 30, p. 40, FN 16) is DENIED.

ORDERED this 3rd day of April, 2017.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE