IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, INC. ("LUPE"); LIONEL LOPEZ; ISABEL ARAIZA; ARLENE LIRA EASTER; ALICIA BENAVIDEZ; ANDRES ROSAS; LENA LORRAINE LOZANO SOLIS; and CARMEN RODRIGUEZ, | § § § § § § § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 2:16-cv-00303 |
| | § | |
| STATE OF TEXAS; GREG ABBOTT, in his official capacity as Governor of Texas; and ROLANDO PABLOS, in his official capacity as Texas Secretary of State, | § § § § § | |
| Defendants. | § | |

**D̲E̲F̲E̲N̲D̲A̲N̲T̲S̲'̲ ̲P̲O̲S̲T̲-̲T̲R̲I̲A̲L̲ ̲B̲R̲I̲E̲F̲**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES.................................................................................. iv

INTRODUCTION ............................................................................................... 1

ARGUMENT AND AUTHORITIES....................................................................... 3

I.  PLAINTIFFS MUST SATISFY A HEAVY BURDEN TO PROVE A VOTE-DILUTION CLAIM UNDER SECTION 2 ........................................................ 3

II.  PLAINTIFFS DID NOT PROVE THAT STATEWIDE JUDICIAL ELECTIONS RESULT IN THE DENIAL OR ABRIDGEMENT OF ANYONE'S RIGHT TO VOTE .. 5

    A.  To Establish Vote Dilution, Plaintiffs Must Show that Minority Voters Would Have a Greater Opportunity to Elect Their Preferred Candidates in an Alternative System ............... 5

    B.  Plaintiffs Made No Effort to Prove that Their Proposed Single-Member Districting Scheme Would Allow Minority Voters to Elect Their Preferred Candidates. ............................... 9

    C.  Plaintiffs Failed to Provide Necessary Evidence Demonstrating District Compactness........................................ 10

III.  PLAINTIFFS ESTABLISHED ONLY THAT SOME HISPANIC-PREFERRED CANDIDATES SUFFER POLITICAL DEFEAT AT THE POLLS–NOT THAT HISPANIC VOTES ARE DILUTED ON ACCOUNT OF RACE OR COLOR............ 11

    A.  To Prevail on a Vote-Dilution Claim, Plaintiffs Must Demonstrate that Divergent Voting Patterns Among Minority and White Voters Are Attributable to Race ............................... 12

    B.  In *LULAC*, the Evidence Did Not Support Plaintiffs' Claim that Minority-Preferred Candidates Were Losing on Account of Race. ....................................................................................... 13

    C.  Plaintiffs Have Not Shown that the Results of Texas Supreme Court and Court of Criminal Appeals Elections Are Attributable to Racial Polarization.............................................. 16

1. The general-election results for statewide judicial offices show that Hispanic candidates receive the same, or more, support as white candidates from the same party ................................................................ 16

2. The Republican primaries do not help Plaintiffs satisfy the *Gingles* preconditions. .................................... 20

3. In Democratic primaries, the Hispanic-preferred candidate prevailed in two out of three races ................. 21

D. Defendants Prevail Even if They Bear the Burden of Proving that Partisanship Best Explains Divergent Voting Patterns in Statewide Judicial Elections. ................................... 22

IV. PLAINTIFFS HAVE NOT SHOWN THAT BASED ON THE TOTALITY OF THE CIRCUMSTANCES, THEY LACK EQUAL ACCESS TO THE POLITICAL PROCESS ................................................................. 24

A. Plaintiffs Cannot Overcome Texas's Interest in Linking the Jurisdictional and Electoral Bases of its Appellate Judges ....... 24

1. *LULAC* recognizes that a state's linkage interest is substantial .................................................................... 24

2. Texas has a substantial linkage interest for its appellate judges ................................................................. 26

3. That the Supreme Court and Court of Criminal Appeals are multi-member bodies does not alter the analysis ..... 28

B. There Has Been Significant Minority Representation on the Challenged Courts Over the Last Three Decades ...................... 29

C. The Totality-of-the-Circumstances Analysis Must Take Into Account the Pool of Eligible High-Court Candidates ................. 31

D. Minorities Have Been Actively Recruited to Seek Statewide Judicial Offices ............................................................ 32

E. Plaintiffs' Totality-of-the-Circumstances Experts Should Be Given No Weight ............................................................ 33

V.   Plaintiffs Lack Standing to Challenge Texas's Method of
Electing Supreme Court Justices and Court of Criminal
Appeals Judges ...................................................................................... 34

Conclusion ................................................................................................ 35

Certificate of Service ............................................................................. 37

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Johnson,*
　521 U.S. 74 (1997) ............................................................................................ 11

*Bartlett v. Strickland,*
　556 U.S. 1 (2009) ............................................................................................... 4

*Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections,*
　835 F. Supp. 2d 563 (N.D. Ill. 2011) ............................................................. 11

*Cousin v. Sundquist,*
　145 F.3d 818 (6th Cir. 1998) ......................................................................... 25

*Davis v. Chiles,*
　139 F.3d 1414 (11th Cir. 1998) ....................................................................... 8

*Fairley v. Hattiesburg, Miss.,*
　584 F.3d 660 (5th Cir. 2009) .................................................................... 6, 11

*Gonzalez v. Harris Cnty., Tex.,*
　601 F. App'x 225 (5th Cir. 2015) ................................................................. 11

*Gregory v. Ashcroft,*
　501 U.S. 452 (1991) .................................................................................. 26, 28

*Growe v. Emison,*
　507 U.S. 25 (1993) ......................................................................... 4, 7, 8, 10

*Guile v. United States,*
　422 F.3d 221 (5th Cir. 2005) ......................................................................... 11

*Hous. Lawyers' Ass'n v. Att'y Gen. of Tex.,*
　501 U.S. 419 (1991) ......................................................................................... 25

*Hunt v. Wash. State Apple Adver. Comm'n,*
　432 U.S. 333 (1977) ......................................................................................... 35

*Johnson v. De Grandy,*
　512 U.S. 997 (1994) ................................................................................ 4, 6, 10

*Lujan v. Defenders of Wildlife,*
　504 U.S. 555 (1992) .................................................................................. 34, 35

iv

*LULAC v. Clements,*
    999 F.2d 831 (5th Cir. 1993) (en banc). ...................................................... *passim*

*Mallory v. Ohio,*
    38 F. Supp. 2d 525 (S.D. Ohio 1997) ........................................................ 9

*Mallory v. Ohio,*
    173 F.3d 377 (6th Cir. 1999) .................................................................... 9

*NAACP v. City of Kyle, Tex.,*
    626 F.3d 233 (5th Cir. 2010) .................................................................. 35

*Nipper v. Smith,*
    39 F.3d 1494 (11th Cir. 1994) (en banc) ................................... 6, 8, 9, 10

*Pope v. County of Albany,*
    687 F.3d 565 (2d Cir. 2012) ..................................................................... 7

*Rodriguez v. Harris Cnty., Tex.,*
    964 F. Supp. 2d 286 (S.D. Tex. 2013) ............................................... 10, 11

*S. Christian Leadership Conf. of Ala. v. Sessions,*
    56 F.3d 1281 (11th Cir. 1995) (en banc) ........................................... 8, 25

*Sensley v. Albritton,*
    385 F.3d 591 (5th Cir. 2004) ................................................................... 4

*Snap-Drape, Inc. v. Comm'r,*
    98 F.3d 194 (5th Cir. 1996) ................................................................... 25

*Teague v. Attala Cnty., Miss.,*
    92 F.3d 283 (5th Cir. 1996) ................................................... 22, 23, 24

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ...................................................................... *passim*

*Uno v. City of Holyoke,*
    72 F.3d 973 (1st Cir. 1995) ........................................................... 6, 7, 10

*Voinovich v. Quilter,*
    507 U.S. 146 (1993) ................................................................................. 4

*Warth v. Seldin,*
    422 U.S. 490 (1975) ........................................................................ 35

*Whitcomb v. Chavis,*
    403 U.S. 124 (1971) ......................................................... 13, 16, 24

## Constitutional Provisions

TEX. CONST. art. V, § 6(a) .............................................................. 28

TEX. CONST. art. V, § 6(b) .............................................................. 28

TEX. CONST. art. V, § 7 .................................................................. 28

TEX. CONST. art. V, § 7a ................................................................ 28

TEX. CONST. art. V, § 8 .................................................................. 28

TEX. CONST. art. V, § 15 ................................................................ 28

TEX. CONST. art. V, § 16 ................................................................ 28

U.S. CONST. amend. XV .................................................................. 4

## Statutes

52 U.S.C. § 10301(a) ............................................................. 4, 5, 12

52 U.S.C. § 10301(b) ................................................................ 5, 32

TEX. GOV'T CODE § 22.201 ............................................................ 28

## Other Authorities

S. Rep. No. 417 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177 ................................. 5, 30

## INTRODUCTION

For the last 142 years, Texans have selected members of the State's highest appellate courts through statewide popular elections. This system—enshrined in the Texas Constitution since 1876—allows every Texas voter to vote for every member of the two courts with statewide jurisdiction. The State's interest in linking the electoral and jurisdictional bases of its judges cannot be understated:

> The decision to make jurisdiction and electoral bases coterminous is more than a decision about how to elect state judges. It is a decision of what *constitutes* a state court judge. Such a decision is as much a decision about the structure of the judicial office as the office's explicit qualifications such as bar membership or the age of judges.

*LULAC v. Clements*, 999 F.2d 831, 872 (5th Cir. 1993) (en banc). Through a century and a half, Texans have shown unwavering support for structuring their highest judicial offices so that every judge is independent from every other state official and accountable to every Texas voter. That structure has caused the membership of the two challenged courts to reflect the State's shifting political landscape. In the last fifty years alone, these courts have undergone a political sea change. Democratic members filled the two courts in the 1970s and 1980s. Over the last twenty years, Republicans have dominated, as they have in all statewide offices.

Against that tradition of linkage through times of extraordinary growth and change, Plaintiffs ask the Court to override the will of Texans and find that the statewide election of Texas Supreme Court justices and Court of Criminal Appeals judges violates Section 2 of the Voting Rights Act. To prevail, Plaintiffs must establish that statewide elections result in the "denial or abridgement" of the right to vote "on

account of race or color." This is a steep burden, as the Supreme Court has drawn a clear distinction between racial vote dilution (which Section 2 prohibits) and mere political defeat at the polls (which Section 2 does not reach). Plaintiffs cannot overcome the State's substantial, deep-rooted linkage interest by proving insubstantial dilution.

Plaintiffs offered scant evidence over just three days of testimony in their attempt to set aside a 142-year-old judicial model. Seven of their ten witnesses testified about their individual, personal experiences as voters or judicial candidates, and their testimony is relevant—if at all—only to the totality-of-the-circumstances inquiry. Likewise, two of their designated experts opined on matters relating only to the totality of the circumstances. One expert presented impermissible legal opinions and a selectively skewed historical perspective. The other made numerous errors, utilized a "haphazard" methodology, and said that five U.S. Supreme Court justices held "pro-white supremacy beliefs."

In the end, Plaintiffs called only one witness to testify on the threshold elements required by Section 2. Yet through her testimony, Plaintiffs did not even attempt to establish that their proposed alternative districting plans would provide Hispanic voters with additional opportunities to elect their candidates of choice. And her own data demonstrated that the election results presented to the Court were attributable to partisanship, not race.

This is not a close case. Plaintiffs did not put on the evidence required to prove their claim, and Defendants are entitled to judgment.

ARGUMENT AND AUTHORITIES

Plaintiffs failed to present the evidence required to prove a Section 2 violation.

*First*, Plaintiffs did not prove that the State's method of electing its high-court members dilutes Hispanic votes. Plaintiffs offered no evidence that their single-member districting plans would create more opportunities than the current system for Hispanic voters to elect their candidates of choice. Without that evidence, the Court cannot conclude that statewide judicial elections dilute Hispanic votes compared to some alternative electoral method.

*Second*, Plaintiffs' own data show that there has not been vote dilution "on account of race or color." The pattern in the data shows that Hispanic candidates received the same levels of voter support as white candidates from the same party. As the en banc majority of the Fifth Circuit held in light of similar data, "[g]iven these facts, we cannot see how minority-preferred judicial candidates were defeated 'on account of race or color.'" *LULAC*, 999 F.2d at 879.

*Third*, Texas's substantial interest in linking the jurisdiction and electoral bases of its high-court members far outweighs Plaintiffs' insubstantial evidence of vote dilution. Thus, even if Plaintiffs could prove the threshold elements of their vote-dilution claim, the totality of the circumstances would favor upholding the State's long-established judicial model.

## I.   PLAINTIFFS MUST SATISFY A HEAVY BURDEN TO PROVE A VOTE-DILUTION CLAIM UNDER SECTION 2.

Section 2 of the Voting Rights Act prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or

abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). The "on account of race or color" requirement reflects the Voting Rights Act's intended aim to "help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall 'be denied or abridged . . . on account of race, color, or previous condition of servitude.'" *Voinovich v. Quilter*, 507 U.S. 146, 152 (1993) (quoting U.S. CONST. amend. XV).

The Supreme Court has provided guidance on how a Section 2 vote-dilution claim can be proven. In a challenge to a multi-member districting scheme, a plaintiff must show, at a minimum, that: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Growe v. Emison*, 507 U.S. 25, 39–40 (1993); *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986) (plurality). These "*Gingles* preconditions" cannot be applied "mechanically" or in isolation. *Voinovich*, 507 U.S. at 158. Instead, they must be read in conjunction with one another and viewed "with[ ] regard to the nature of the claim." *Id.*; *accord Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). And a plaintiff's failure to establish any of the three preconditions defeats a Section 2 claim. *Sensley v. Albritton*, 385 F.3d 591, 595 (5th Cir. 2004).

Only if a plaintiff establishes all three *Gingles* requirements does the Court then turn to the totality-of-the-circumstances analysis. *Bartlett v. Strickland,* 556 U.S. 1, 11–12 (2009) (plurality); *Sensley*, 385 F.3d at 595. At this stage, a plaintiff

must show that, based on the "totality of circumstances," minority voters have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Courts are guided in this inquiry by factors identified in a 1982 Senate report to the Voting Rights Act. *LULAC*, 999 F.2d at 849 & n.22 (citing S. Rep. No. 417 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177). In a challenge to a state's judicial model, the totality-of-the-circumstances test also requires the Court to balance the state's linkage interest against a plaintiff's evidence of racial vote dilution. *See id.* at 868. The vote-dilution evidence must be "substantial" to overcome the linkage interest. *Id.* at 868, 876.

## II. PLAINTIFFS DID NOT PROVE THAT STATEWIDE JUDICIAL ELECTIONS RESULT IN THE DENIAL OR ABRIDGEMENT OF ANYONE'S RIGHT TO VOTE.

Section 2 first requires proof of voting denial or abridgment. 52 U.S.C. § 10301(a). Plaintiffs claim that statewide judicial elections deny or abridge Hispanic votes by diluting their voting strength. 1st Am. Compl. ¶¶ 21, 26, 27 (ECF No. 24). Yet Plaintiffs did not even attempt to prove that their proposed single-member districting plans would provide Hispanic voters with additional opportunities to elect their candidates of choice. Because they have not provided any basis to compare the actual voting strength under the current system *and* the projected voting strength under a proposed alternative system, Plaintiffs have not proven that the current system dilutes Hispanic voting strength compared to some alternative system.

### A. To Establish Vote Dilution, Plaintiffs Must Show that Minority Voters Would Have a Greater Opportunity to Elect Their Preferred Candidates in an Alternative System.

In a Section 2 vote-dilution challenge, a plaintiff must prove that the

challenged electoral system dilutes the votes of the minority community. Section 2 requires proof "that the use of a multimember electoral structure operates to minimize or cancel out [minority voters'] ability to elect their preferred candidates." *See Gingles*, 478 U.S. at 48.

To establish that the challenged system minimizes or cancels out minority voters' ability to elect their preferred candidates, Plaintiffs must show that there is some alternative that would provide greater opportunity for minority voters to elect their candidates of choice. *See, e.g.*, *De Grandy*, 512 U.S. at 1008 (*Gingles* "requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice"); *Gingles*, 478 U.S. at 50 n.17 ("Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."). Logically, the existing system "cannot be responsible for [the minority] group's inability to elect its candidates" if minorities would be unable to elect their "preferred candidates under some reasonable alternative scheme." *Uno v. City of Holyoke*, 72 F.3d 973, 979 (1st Cir. 1995) (citation and quotation marks omitted); *accord Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 667–71 (5th Cir. 2009); *Nipper v. Smith*, 39 F.3d 1494, 1530–31 (11th Cir. 1994) (en banc).

Plaintiffs argue they can prove increased minority opportunity simply by creating plans with two districts that contain majority Hispanic citizen voting age populations ("HCVAP"). Trial Tr. 5:18–6:11 (Feb. 15, 2018) (closing argument). And

they argue that the Court need not evaluate minority voting strength in their alternative plans until the remedial phase—*i.e.*, only *after* the Court finds liability. *Id.* at 6:12–14 ("The court may consider at the remedial stage what type of remedy is possible, but this difficulty should not impede the judge at the liability stage . . . ."). Both contentions are foreclosed by well-established precedent.

First, proving that minority voters have the "potential to elect" in an alternative system is not satisfied by the numerical threshold in the first *Gingles* precondition alone. Instead, the first and second *Gingles* preconditions must be read together: "The 'geographically compact minority' and 'minority political cohesion' showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40. The HCVAP-majority rule is a necessary threshold, but it is not by itself sufficient. *See Pope v. County of Albany*, 687 F.3d 565, 575 (2d Cir. 2012) ("[A] simple majority rule usefully serves at the outset to screen out cases in which there is no point in undertaking a full Section 2 analysis. Toward that end, it asks a preliminary question; it does not attempt to answer the ultimate one."). The ultimate question of whether the challenged practice dilutes minority votes can be answered only by analyzing demographic data along with cohesion and polarization levels to show that Plaintiff's proposed plans would provide minority voters with more opportunity to elect their candidates of choice than the challenged system. *Uno*, 72 F.3d at 979 ("The first two *Gingles* preconditions look to whether, putting the challenged practice, procedure, or structure to one side, minority voters within a given constituency have

the potential to elect representatives of their choice."). Without that analysis, Plaintiffs cannot prove that the challenged system dilutes minority votes.

Nor, as Plaintiffs suggest, is the minority-opportunity inquiry relevant only at the remedial stage of a vote-dilution challenge. The Supreme Court has held that unless a plaintiff proves that a remedy exists to give minority voters more electoral opportunity, the current system cannot be said to cause dilution (*i.e.*, no Section 2 liability):

> The "geographically compact majority" and "minority political cohesion" showings are needed to establish that the minority has the **potential to elect** a representative of its own choice in some single-member district. And the "minority political cohesion" and "majority bloc voting" showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population. Unless these points are established, **there neither has been a wrong nor can be a remedy**.

*Growe*, 507 U.S. at 40–41 (emphasis added) (citations omitted). In other words, remedy and liability "cannot be separated," and "the issue of remedy is part of the plaintiff's *prima facie* case" in any Section 2 vote-dilution challenge. *Nipper*, 39 F.3d at 1530–31. As part of this inquiry, the court must determine "whether it can fashion a permissible remedy in the particular context of the challenged system." *Id.*; *accord S. Christian Leadership Conf. of Ala. v. Sessions*, 56 F.3d 1281, 1289 (11th Cir. 1995) (en banc) ("*SCLC*") (first *Gingles* precondition requires showing that "an appropriate remedy can be fashioned").[1]

---

[1] In *Nipper*, the Eleventh Circuit found that the first *Gingles* precondition also requires a "remedy within the confines of the state's judicial model that does not undermine the administration of justice." 39 F.3d at 1531; *see also Davis v. Chiles*, 139 F.3d 1414, 1421 (11th Cir. 1998) (in a Section 2 suit, the court "must carefully consider the impact that any remedial proposal would have on the judicial model enshrined in a state's constitution or statutes"). The *Nipper* court reasoned that "[i]mplicit in this first

Plaintiffs' own expert concedes an analysis of minority voting strength under an alternative plan is required at the liability stage. Dr. Lisa Handley acknowledged that in a Section 2 vote-dilution case, "the level of future voting strength under the challenged plan is compared with some hypothetical, illustrative plan presented by the plaintiffs to see whether the new plan is dilutive." Trial Tr. 32:16–21 (Feb. 14, 2018) (Handley). Demographics alone do not answer that question, and a 50% HCVAP threshold is not adequate to prove that additional reasonable opportunities would exist. *Id.* at 24:5–12. In undertaking the necessary analysis, according to Dr. Handley, "the key is estimating future minority voting strength" under the new plan. *Id.* at 32:8–13, 32:22–24. Hence, Dr. Handley explained, "the central question when analyzing a new plan or a hypothetical alternative proposed by the plaintiffs is how many representatives preferred by minority voters are likely to be elected under each competing plan and with what degree of certainty." *Id.* at 33:9–14.

B.   **Plaintiffs Made No Effort to Prove that Their Proposed Single-Member Districting Scheme Would Allow Minority Voters to Elect Their Preferred Candidates.**

Plaintiffs did not answer the question that their own expert agrees is "central" to a vote-dilution claim: whether minority-preferred candidates are likely to win elections in an alternative system. In fact, Plaintiffs argue that this showing is

---

*Gingles* requirement is a limitation on the ability of a federal court to abolish a particular form of government and to use its imagination to fashion a new system." *Nipper*, 39 F.3d at 1531; *accord Mallory v. Ohio*, 38 F. Supp. 2d 525, 576 (S.D. Ohio 1997) (finding, in a Section 2 challenge to at-large elections of trial and appellate judges, that it "lack[ed] the power or authority to fashion a remedy that would alter the structure of the State of Ohio's judicial branch"), *aff'd on other grounds*, 173 F.3d 377 (6th Cir. 1999). Here, Plaintiffs have not identified an appropriate remedy, as their single-member districting scheme would shelve a judicial model long enshrined in the Texas Constitution and sever the State's well-settled linkage interest. *See infra* Part IV.A.

unnecessary to prove liability. *See supra* Part II.A. At trial, Plaintiffs relied entirely on maps and demographic data relating to two proposed single-member plans for the Supreme Court and Court of Criminal Appeals. Plaintiffs did not present statistically reliable evidence to prove that their demonstration plans would provide Hispanic voters the opportunity to elect their candidates of choice in the two HCVAP-majority districts in each plan. Trial Tr. 24:1–4 (Feb. 14, 2018) (Handley). Dr. Handley did not offer any testimony or performance analysis to show which candidates would have won (or how frequently) in her illustrative districts. *Id.* at 24:1–4, 29:2–5. Nor did Plaintiffs submit any evidence relating to any of the multiple factors that, according to Dr. Handley, could affect whether a district would elect minority voters' candidates of choice—including the extent of minority cohesion, white crossover vote, and turnout in the alternative plan. *Id.* at 24:25–26:1.

As such, Plaintiffs have not shown that their single-member districting plans would provide Hispanic voters with more opportunity to elect their preferred candidates than the current system. Plaintiffs have therefore failed to prove that Texas's existing model dilutes the votes of Hispanic voters. *See Growe*, 507 U.S. at 40–41; *Uno*, 72 F.3d at 979; *Nipper*, 39 F.3d at 1530–31.

## C. Plaintiffs Failed to Provide Necessary Evidence Demonstrating District Compactness.

What is more, Plaintiffs did nothing to show—as they must—that their proposed districts are reasonably compact. *See De Grandy*, 512 U.S. at 1008.[2] Over

---

[2] *See also Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 725 (S.D. Tex. 2013) (where plaintiff offers maps to satisfy first *Gingles* factor, it "must introduce a demonstration map that creates a

time, courts have utilized several objective tests to provide a concrete measure of compactness. *See, e.g.*, *Rodriguez*, 964 F. Supp. 2d at 740–44; *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp. 2d 563, 570 (N.D. Ill. 2011). Here, Plaintiffs did not present a single compactness measure for their proposed plans. Nor did they offer testimony on how the compactness of their districts compared to any legislatively enacted districts. Instead, Plaintiffs relied entirely on Dr. Handley's unsupported opinion that her plans are geographically compact. Trial Tr. 151:7–11 (Feb. 13, 2018) (Handley). But an expert's *ipse dixit* is not legally sufficient evidence. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005). Without such proof, the Court is "flatly unable to evaluate whether a possible redistricting scheme would establish legally adequate districts consistent with traditional districting principles such as compactness." *Rodriguez*, 964 F. Supp. 2d at 738 (quoting *Fairley*, 584 F.3d at 669). Plaintiffs thus have not shown their proposed plans are reasonably compact.[3] Their vote-dilution claim fails.

## III. PLAINTIFFS ESTABLISHED ONLY THAT SOME HISPANIC-PREFERRED CANDIDATES SUFFER POLITICAL DEFEAT AT THE POLLS—NOT THAT HISPANIC VOTES ARE DILUTED ON ACCOUNT OF RACE OR COLOR.

Even if Plaintiffs did show that statewide judicial elections dilute Hispanic votes (which they did not), Section 2 requires Plaintiffs to prove that the dilution

---

geographically compact single-member district in which the majority of the citizen voting age population is Latino"), *aff'd sub. nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015).

[3] The compactness analysis also must consider how a plan combines or divides communities of interest and traditional boundaries. *See Abrams v. Johnson*, 521 U.S. 74, 92 (1997); *Fairley*, 584 F.3d at 669–70. Plaintiffs did not consider these factors in drawing their proposed plans. *See generally* Trial Tr. 17:12–20:15 (Feb. 14, 2018) (Handley).

occurs "on account of race or color." 52 U.S.C. § 10301(a). But Plaintiffs' own data shows that voting patterns in statewide judicial elections do not change depending on the race or ethnicity of the candidate. Hispanic candidates receive the same levels of support as white candidates from the same party. That is the same thread that ran throughout the plaintiffs' claims in *LULAC*—the same thread that the Fifth Circuit ruled was an "insubstantiality of proof" that minority-preferred candidates "lost 'on account of race.'" *LULAC*, 999 F.2d at 877.

### A.   To Prevail on a Vote-Dilution Claim, Plaintiffs Must Demonstrate that Divergent Voting Patterns Among Minority and White Voters Are Attributable to Race.

To prove vote dilution "on account of race," Plaintiffs cannot simply produce statistics showing that Hispanic and white voters tend to support different candidates and that the Hispanic-preferred candidate usually loses. *See id.* at 850. In *LULAC*, the district court incorrectly interpreted Section 2 to require plaintiffs to demonstrate only "that whites and blacks generally support different candidates to establish legally significant white bloc voting." *Id.* The Fifth Circuit expressly rejected this approach:

> Unless the tendency among minorities and whites to support different candidates, and the accompanying losses by minority groups at the polls, are somehow tied to race . . . plaintiffs' attempt to establish legally significant white bloc voting, and thus their vote dilution claim under § 2, must fail. When the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens in the contested counties . . . the district court's judgment must be reversed.

*Id.* The Fifth Circuit emphasized that Section 2 is not limitless—its protections "extend only to defeats experienced by voters 'on account of race or color.'" *Id.* The

district court's approach to racially polarized voting in *LULAC* eviscerated this standard:

> In holding that the failure of minority-preferred candidates to receive support from a majority of whites on a regular basis, without more, sufficed to prove legally significant racial bloc voting, the district court loosed § 2 from its racial tether and fused illegal vote dilution and political defeat.

*Id.* The district court in *LULAC* also ignored controlling precedent that, among other things, "established a clean divide between actionable vote dilution and 'political defeat at the polls.'" *Id.* at 850–51 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 153 (1971)). Those authorities "unmistakably prescribe[d] the very inquiry into the causes underlying the lack of support for minority-preferred candidates among white voters with which the district court dispensed." *Id.* at 854, 855–58.

### B.   In *LULAC*, the Evidence Did Not Support Plaintiffs' Claim that Minority-Preferred Candidates Were Losing on Account of Race.

After outlining the standard for proving racially polarized voting, the *LULAC* court assessed whether the plaintiffs had established that Texas's system of electing trial judges in countywide elections diluted the voting power of minorities "on account of race or color." The Fifth Circuit held that it did not. As to each of the nine counties that plaintiffs challenged, the en banc majority rejected the district court's vote-dilution findings. *Id.* at 877–93. The Fifth Circuit made clear why: "One thread runs throughout the plaintiffs' case in all of the counties—an insubstantiality of proof that the minority-preferred candidate lost 'on account of race.'" *Id.* at 877.

In Dallas County, for example, the evidence reflected that "[r]oughly 61%–77% of white voters consistently supported Republicans, even when black Republicans ran

13

against white Democrats." *Id.* at 878. Likewise, "black Democrats also won as large a percentage of the white vote as white Democratic candidates." *Id.* Based on that evidence, the Fifth Circuit could not find that minority votes were being diluted on account of race or color:

> The point is that a black Democratic voter and a white Democratic voter stand in the same position. Both are unable to elect the Democratic judicial candidate they prefer.
>
> We repeat. The race of the candidate did not affect the pattern. White voters' support for black Republican candidates was equal to or greater than their support for white Republicans. Likewise, black and white Democratic candidates received equal percentages of the white vote. Given these facts, we cannot see how minority-preferred judicial candidates were defeated "on account of race or color." Rather, the minority-preferred candidates were consistently defeated because they ran as members of the weaker of two partisan organizations. We are not persuaded that this is racial bloc voting as required by *Gingles*.

*Id.* at 879; *see also id.* ("The undisputed facts permit no conclusion but that the defeat of black-preferred candidates was the result of the voters' partisan affiliation.").

The results were much the same in Harris County. There, as in Dallas, "voters' preferences were strongly influenced, if not dictated, by partisan affiliation." *Id.* at 882. The evidence indicated that the candidate preferred by black voters "was always the Democratic candidate," regardless of the candidate's race. *Id.* at 882–83. And "[t]he Republican candidate always won the white vote, generally taking between 55% and 65%, whether the Republican candidate was black, Hispanic, or Anglo." *Id.* at 883. Given these facts, the Fifth Circuit concluded "as a matter of law that plaintiffs' proof at best produce[d] only a marginal case in Harris County." *Id.* at 885.

The plaintiffs' claims also failed in Bexar County, where partisan affiliation "account[ed] for much of the voting patterns." *Id.* at 889. Notably, most Anglo voters were Republicans and most Hispanic voters were Democrats. *Id.* This was the case regardless of the race of the candidate: "Anglo voters gave a majority of their votes to Republicans, and Hispanic voters gave a majority of their votes to Democrats, even when Hispanic Republican candidates faced Anglo Democratic opponents." *Id.* So any proof of dilution in Bexar County was "meager at best." *Id.* [4]

Similarly, in Lubbock County, the undisputed facts showed that general-election results were driven by "partisan affiliation and not racial politics." *Id.* at 892. In the elections that the parties analyzed, the minority-preferred candidate—always a Democrat—"consistently lost to a Republican opponent, regardless of the ethnicity of the candidates." *Id.* So, the Fifth Circuit found, "voting patterns in Lubbock County were unaffected by the race of the candidates," instead "result[ing] from party loyalty." *Id.*

Plaintiffs' own expert, Dr. Handley, acknowledges that proving racially polarized voting is the "evidentiary linchpin" of a vote-dilution suit. Trial Tr. 201:6–8 (Feb. 13, 2018) (Handley). And she accepts that "if partisan affiliation, not race, was responsible for the defeat of the minority-preferred candidate then there can be no finding of racial vote dilution." *Id.* at 235:5–12. That principle, as applied and explained by Dr. Handley, means that if "minority voters supported the minority

---

[4] *See also LULAC*, 999 F.2d at 887 (rejecting vote-dilution findings in Tarrant County where the evidence reflected that "black candidates won as great a share of white votes as white candidates, if we control for party affiliation").

candidate not because he was black or Hispanic but because he was a Democrat, while non-minority voters opposed that candidate not because he was minority but because he was a Democrat (and not a Republican), then voting was not racially polarized." *Id.* at 234:11–22. Yet that is precisely what Dr. Handley's analyses show here.

### C. Plaintiffs Have Not Shown that the Results of Texas Supreme Court and Court of Criminal Appeals Elections Are Attributable to Racial Polarization.

Just as the Section 2 vote-dilution claims failed in *LULAC*, so too does Plaintiffs' claim here. The evidence does not demonstrate that minority-preferred judicial candidates are losing on account of race or color. Instead, the evidence shows that minority voters are suffering, at most, mere "political defeat[s] at the polls." *LULAC*, 999 F.2d at 850 (quoting *Whitcomb*, 403 U.S. at 153).

#### 1. The general-election results for statewide judicial offices show that Hispanic candidates receive the same, or more, support as white candidates from the same party.

Dr. Handley estimated levels of Hispanic and non-Hispanic support for candidates in 13 racially contested general elections for statewide judicial offices from 2002 to 2016. *See* PX-124; Trial Tr. 201:21–202:3 (Feb. 13, 2018) (Handley). In 11 of the 13 races, there were candidates from both major political parties. PX-124. In all 11 of those elections, Hispanic voters preferred the Democratic candidate at levels of 70%–85%. *Id.*; Trial Tr. 202:25–203:2 (Feb. 13, 2018) (Handley). Most non-Hispanic voters preferred the Republican candidates in those 11 elections, although 30%–40% of non-Hispanic voters supported the Democratic candidates. PX-124; Trial Tr. 220:16–19 (Feb. 13, 2018) (Handley).

Critical to this case, non-Hispanic levels of support did not materially change depending on the race of the candidate. PX-124; Trial Tr. 203:16–208:7, 214:6–220:19 (Feb. 13, 2018) (Handley). Non-Hispanic voters lent as much—or even more—support to Hispanic candidates (Democrats and Republicans) as they did to non-Hispanic candidates of the same party. PX-124; Trial Tr. 223:4–7 (Feb. 13, 2018) (Handley).

The two 2016 Texas Supreme Court races analyzed by Dr. Handley illustrate this point perfectly. For Place 9, Hispanic incumbent Justice Eva Guzman ran as the Republican candidate against a non-Hispanic Democrat, Savannah Robinson. According to Dr. Handley's ecological inference estimates, Justice Guzman received 65.8% of the non-Hispanic vote, and Ms. Robinson received 29.8% of the non-Hispanic vote. PX-124 at 4. For Place 5, white Republican incumbent Justice Paul Green ran against a Hispanic Democrat, Dori Contreras Garza. Justice Green received 65.4% of the non-Hispanic vote, and Ms. Contreras Garza received 30.2% of the non-Hispanic vote. *Id.* That means Justice Guzman, a Hispanic incumbent candidate, received more non-Hispanic support than Justice Green, a white incumbent candidate:

| Eva Guzman | L | R | 65.8 |
| Paul Green | | R | 65.4 |

PX-124 at 4. That undoubtedly helped Justice Guzman receive more votes than any other candidate in Texas history. *See* DX-40 at 4. Similarly, Ms. Contreras Garza, a Hispanic Democrat running against a white Republican, received more non-Hispanic support than Ms. Robinson, a white Democrat running against a Hispanic Republican:

17

| Dori Contreras Garza | L | D | 30.2 |
| Savannah Robinson |  | D | 29.8 |

PX-124 at 4.[5]

Across the 11 racially contested general elections that included both major parties, Dr. Handley's analysis shows that Hispanic Democrats did better than white Democrats with both Hispanic and non-Hispanic voters:

|  | Handley EI | |
|---|---|---|
|  | %Lat Supp | %NL Supp |
| Hispanic Candidate | 81.6% | 34.5% |
| Anglo Candidate | 71.8% | 29.6% |
| Hispanic-Anglo Candidates | 9.8% | 4.9% |

DX-25. The same is true for Hispanic Republicans. DX-26. In other words, "the race of the candidate did not affect the pattern." *LULAC*, 999 F.2d at 879. These results disprove Plaintiffs' claim of racial polarization. *Id.* at 880 (rejecting dilution findings where record "show[ed] that, when one controls for party, black candidates did as well as, *or better than*, white candidates in winning the white voter and elections").

The analysis conducted by Defendants' expert, Dr. John Alford, further confirms this point. Dr. Alford analyzed all 33 statewide judicial general-election contests from 2002 to 2016 that included candidates from both major parties. DX-25; Trial Tr. 221:9–12 (Feb. 14, 2018) (Alford). Hispanic voters preferred the Democratic

---

[5] That pattern holds true in Dr. Handley's analysis of the same two 2016 Supreme Court races using census population data to separate non-Hispanic voters into white voters and black voters. PX-127. The two Hispanic candidates, Justice Guzman and Ms. Contreras Garza, received as much support from white voters as the two white candidates, Justice Green and Ms. Robinson. *Id.* at 3; Trial Tr. 211:19–214:3 (Feb. 13, 2018) (Handley).

candidate in all 33 races. DX-25; Trial Tr. 225:16–19 (Feb. 14, 2018) (Alford). Dr.

Alford's analyses show that Hispanic Democrats have a slight advantage over white

Democrats among both Hispanic and non-Hispanic voters:

|  | EI | |
| --- | --- | --- |
|  | %Lat Supp | %NL Supp |
| Hispanic Candidate | 88.4% | 35.6% |
| Anglo Candidate | 83.9% | 34.1% |
| Hispanic-Anglo Candidates | 4.6% | 1.5% |

DX-25. The same goes for Hispanic Republicans. DX-26. Dr. Handley did not—and

could not—dispute those findings. Trial Tr. 226:11–227:17 (Feb. 13, 2018) (Handley).

In the 16 general-election races that did not include a Democratic candidate,

Hispanic voters did not vote cohesively. Based on Dr. Alford's data relied on by Dr.

Handley, only three times did Hispanic voters lend over 60% support to one candidate

in those 16 elections, and in two of those three races, Hispanic and non-Hispanic

voters supported the same candidate—the Republican—who prevailed both times.

Trial Tr. 240:2–5, 240:24–241:1, 250:5–8, 257:22–25 (Feb. 13, 2018) (Handley); Trial

Tr. 234:11–13, 236:24–237:2 (Feb. 14, 2018) (Alford).

Simply put, the record evidence shows that Hispanic candidates for statewide

judicial office in Texas do not suffer a disadvantage in their electoral chances as

compared to white candidates of the same party. In fact, Hispanic candidates tend to

receive as much, or more, support from Hispanic and non-Hispanic voters as white

candidates from the same party. When Hispanic-preferred candidates lose, it is

because they "ran as members of the weaker of two partisan organizations." *LULAC*,

999 F.2d at 879. This is the precise pattern that repeated over and over in *LULAC*—and the en banc majority consistently ruled that this pattern does not prove legally significant racially polarized voting. *See id.* at 877–93. Thus, as the Fifth Circuit found in *LULAC*, Plaintiffs here have not established that minority votes are being diluted on account of race or color.

### 2. The Republican primaries do not help Plaintiffs satisfy the *Gingles* preconditions.

Nor can Plaintiffs look to the Republican primary elections to support their vote-dilution claim. The parties' experts analyzed three primaries and one runoff election. *See* PX-126; DX-27. There are four critical takeaways from these elections.

First, there is no Hispanic cohesion in the Republican primaries. Both parties' ecological inference analyses reflect that Hispanic support for any one candidate in the four primary elections topped 60% only once—for Justice Guzman's 2016 reelection bid. PX-126; DX-27; Trial Tr. 237:20–238:12 (Feb. 14, 2018) (Alford).

Second, there is no white-bloc voting in the Republican primaries. Both parties' analyses show that non-Hispanic voters never gave more than 60% support to any one candidate in the four elections. PX-126; DX-27; Trial Tr. 240:14–19 (Feb. 14, 2018) (Alford).

Third, white voters and Hispanic voters supported the same candidate in each of the four Republican races. PX-126; DX-27. This includes the 2002 primary in which, according to Dr. Handley's ecological inference analysis, Hispanic and non-Hispanic voters supported Steven Wayne Smith, the white candidate, over Justice Rodriguez, the Hispanic candidate. PX-126 at 1; DX-27.

Fourth, the same candidate who received the support of white and Hispanic voters won the Republican primary each time. PX-126. So, in the Republican primaries analyzed by the parties, the Hispanic candidate of choice is not defeated by white-bloc voting. Trial Tr. 241:8–24 (Feb. 14, 2018) (Alford).

### 3. In Democratic primaries, the Hispanic-preferred candidate prevailed in two out of three races.

The Democratic primaries do not help carry Plaintiffs' burden of proving racial vote dilution either. These contests do not show that the Hispanic-preferred candidate is usually defeated by non-Hispanic voters.

Dr. Handley analyzed the two racially contested Democratic primaries for statewide judicial office since 2002. PX-125. The Hispanic-preferred candidate won one of the two primaries. *Id.*; Trial Tr. 267:23–268:1 (Feb. 13, 2018) (Handley). This 50% success rate does not indicate that the Hispanic-preferred candidate was consistently defeated within the meaning of the third *Gingles* precondition. On this exact fact pattern, the Fifth Circuit ruled that the plaintiffs did not establish vote dilution in Lubbock County by relying on two Democratic primary races. *LULAC*, 999 F.2d at 892–93. In one of these elections, the minority-preferred candidate won a majority of the votes; so the primaries "[did] not indicate that the minority-preferred candidate was consistently defeated within the meaning of *Gingles*." *Id.*

The third and only other Democratic primary for a statewide judicial office since 2002 was between two non-Hispanic candidates. PX-134. In that contest, Hispanic voters preferred the same candidate as non-Hispanic voters. *Id.*; Trial Tr. 272:4–6 (Feb. 13, 2018) (Handley). The candidate preferred by both groups of voters

won the Democratic primary. Trial Tr. 272:11–13 (Feb. 13, 2018) (Handley).

So out of the three Democratic primaries for statewide judicial office since 2002, the Hispanic-preferred candidate won two of the races. *Id.* at 272:14–16. The ultimate determination of whether racially polarized voting exists cannot rely on the results of one election. *Id.* at 272:23–273:1; *see Gingles*, 478 U.S. at 57. As in *LULAC*, the Democratic primaries analyzed here "do not indicate that the minority-preferred candidate was consistently defeated within the meaning of *Gingles*, and they cannot establish dilution." *LULAC*, 999 F.2d at 892–93.

### D. Defendants Prevail Even if They Bear the Burden of Proving that Partisanship Best Explains Divergent Voting Patterns in Statewide Judicial Elections.

Plaintiffs attempt to avoid the clear implications of the data by trying to shift the burden of proof. They contend that Defendants carry the burden to "prove indisputably that the polarization in this case is best explained by partisanship." Trial Tr. 12:9–15 (Feb. 12, 2018) (opening argument); *see also* Trial Tr. 38:12–17 (Feb. 15, 2018) (closing argument) (citing *Teague v. Attala Cnty., Miss.*, 92 F.3d 283 (5th Cir. 1996)). But that argument is both unfounded and immaterial. The Fifth Circuit has not held that defendants bear the burden of disproving race-based voting. And in any event, the evidence proves that voting patterns are motivated by partisanship, not race. Three points merit mention here.

First, in *LULAC*, the en banc majority expressly declined to decide which party bore the burden of explaining the role of partisanship. 999 F.2d at 860. In that case, "the result [was] the same" regardless of whether the plaintiffs' obligation to "prove

bloc voting includes the burden to explain partisan influence . . . [or] the partisan voting is viewed as a defensive parry." *Id.* But the Fifth Circuit recognized there was a "powerful argument supporting a rule that plaintiffs, to establish legally significant racial bloc voting, must prove that their failure to elect representatives of their choice cannot be characterized as a 'mere euphemism for political defeat at the polls,' or the 'result of 'partisan politics.'" *Id.* at 859 (citations omitted). And the en banc majority found that in each challenged county, the plaintiffs had failed to prove that minority-preferred candidates lost on account of race. *Id.* at 877–93.

Second, the panel opinion in *Teague* does not support Plaintiffs' argument. *Teague* involved a Section 2 challenge to districting plans adopted by Attala County, Mississippi for its county supervisors and constables. 92 F.3d at 284. The evidence reflected that black candidates were unsuccessful for county-wide offices "during modern times," and the parties' statistical analyses showed that black voters overwhelmingly supported black candidates and white voters overwhelmingly supported white candidates. *Id.* at 285, 289. The Fifth Circuit concluded that given the "compelling evidence" of racially polarized voting, the district court erred by requiring the plaintiffs to prove that "factors such as a candidate's experience, qualifications, education and contact with the electorate are of much greater significant than race to voters in Attala County." *Id.* at 290. But the Fifth Circuit made clear that "the ultimate inquiry of Section 2 is racial discrimination," and a plaintiff must "present evidence of racial bias operating in the electoral system by proving up the *Gingles* factors." *Id.* at 290, 295. And, the court emphasized, *LULAC*

"concerned a different problem—the role of partisan politics"; so the en banc decision did not resolve the challenge in *Teague*. *Id.* at 295.

Third, Plaintiffs should bear the burden of explaining partisan voting in light of Section 2's "clean divide between actionable vote dilution and 'political defeat at the polls.'" *LULAC*, 999 F.2d at 850 (quoting *Whitcomb*, 403 U.S. at 153); *see also id.* at 859. But on this record, the Court need not decide precisely what each party must demonstrate on the issue. Either way, *LULAC* compels a finding that Plaintiffs have not proven Texas's system of electing its high-court members dilutes the votes of minorities on account of race or color. *See supra* Parts III.B, C. Plaintiffs have not shown that Texans are motivated by racial bias in their voting patterns—just as the *LULAC* plaintiffs failed to do in each challenged county. The evidence shows, to the contrary, that voting patterns are determined by partisan preference, not race. Thus, even if Defendants bear the burden of "explain[ing] partisan influence," *LULAC* requires rejecting Plaintiffs' vote-dilution claim. *LULAC*, 999 F.2d at 860, 877–93.

## IV. PLAINTIFFS HAVE NOT SHOWN THAT BASED ON THE TOTALITY OF THE CIRCUMSTANCES, THEY LACK EQUAL ACCESS TO THE POLITICAL PROCESS.

Even if Plaintiffs could establish all three *Gingles* preconditions, their claim would still fail because they cannot satisfy the totality-of-the-circumstances inquiry.

### A. Plaintiffs Cannot Overcome Texas's Interest in Linking the Jurisdictional and Electoral Bases of its Appellate Judges.

#### 1. *LULAC* recognizes that a state's linkage interest is substantial.

In *LULAC*, the en banc majority evaluated Texas's interest in linking its district judges' jurisdictional and electoral bases. 999 F.2d at 868–76. At the outset,

the court recognized that the substantiality of a state's linkage interest is a legal question, not a factual inquiry examined "on a county-by-county basis." *Id.* at 871.[6] This interest must be "balanced against localized evidence of racial vote dilution" in the totality-of-the-circumstances analysis. *Id.* at 868. To defeat the state's linkage interest, there must be "substantial" evidence of vote dilution—the interest "cannot be overridden by evidence that sums to a marginal case." *Id.* at 868, 876.

The *LULAC* plaintiffs did not come close to overcoming Texas's linkage interest. The evidence of vote dilution was marginal, even if the district court's findings were correct. *See id.* at 877. On the other end of the scale, the State's linkage interest was "substantial" and "integral to the judicial office." *Id.* at 872.[7] Linkage existed throughout Texas's 143-year history of judicial elections. *See id.* at 869. And it "advance[d] the state's substantial interest in judicial effectiveness," while "balanc[ing] accountability and judicial independence." *Id.* at 868.[8]

For the Fifth Circuit, the State's decision to link the jurisdictional and electoral bases of its district judges was "more than a decision about how to elect state judges." *Id.* at 872. It was a critical component of how Texas structured its judiciary, *id.*,

---

[6] Because the weight of the State's linkage interest is a question of law, the Court should give no consideration to the testimony of Plaintiffs' expert, Jose Roberto Juarez, regarding *LULAC*'s linkage analysis or how that analysis should apply to Texas's method of electing its high-court members. *See* Defs.' Mot. to Exclude (ECF No. 65); *e.g.*, *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996).

[7] *See also Hous. Lawyers' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419, 426 (1991) (recognizing Texas's interest in maintaining link between district judge's jurisdictional and electoral bases).

[8] *See also Cousin v. Sundquist*, 145 F.3d 818, 821–22, 827 (6th Cir. 1998) (linkage ensures a judge "serves the entire jurisdiction from which he or she is elected, and that the entire electorate which will be subject to that judge's jurisdiction has the opportunity to hold him or her accountable at the polls"); *SCLC*, 56 F.3d at 1297 (system of electing trial judges on a circuit-wide and county-wide basis "foster[s] an independent judiciary by holding judges accountable to a broad section of the population").

finding support in "the authority of the people of the States to determine the qualifications of their most important government officials," *id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991)). The interest also had deep historical roots:

> The collective voice of generations by their unswerving adherence to the principle of linkage through times of extraordinary growth and change speaks to us with power. Tradition, of course, does not make right of wrong, but we must be cautious when asked to embrace a new revelation that right has so long been wrong. There is no evidence that linkage was created and consistently maintained to stifle minority votes.

*Id.* And the linkage interest could not be adequately accommodated through means other than Texas's existing system. *See id.* at 875–76. Thus, district-wide elections for the State's trial judges were "not simply another electoral alternative." *Id.* at 872.

### 2.    Texas has a substantial linkage interest for its appellate judges.

The State's linkage interest should be accorded similar weight in this case. Since Texas became a state in 1845, voters have been able to select each Supreme Court member through statewide popular elections for 161 of 173 years. The State first adopted popular elections for its Supreme Court justices in 1850. Trial Tr. 90:19–91:7 (Feb. 14, 2018) (Ariens). The popular-election model was in place until 1869 and later reinstituted in the 1876 Constitution. *Id.* at 94:19–24, 97:14–19. In the twelve years where Texas did not utilize popular elections, justices were appointed by the Governor and confirmed by the Senate. *Id.* at 89:14–19, 94:19–24. Under this method, the Governor could select justices from anywhere in the State. *Id.* at 89:24–90:1, 95:7–9. And throughout Texas's 173-year history, the Supreme Court's geographic jurisdiction has been "co-extensive with the limits of the State." *Id.* at 89:20–23,

91:20–22, 95:10–12, 97:20–24. The Court of Criminal Appeals was created in 1891, and its members have always been elected through statewide popular elections, with its jurisdiction extending across the State. *Id.* at 100:21–101:12.

The State's decision to link the jurisdictional and electoral bases of its statewide appellate judges is a reasonable way to advance important state interests. When Texas adopted statewide popular elections for Supreme Court justices in the 1800s, it followed a nationwide shift toward elected judiciaries. *Id.* at 98:22–100:9. Texas's move to a popular-election model was part of the broader Jacksonian movement, which advanced notions of popular sovereignty—*i.e.*, rule by the people themselves. *Id.* at 92:7–20. Electing high-court members through statewide popular elections furthers Texas's interests in judicial accountability and independence, as elected judges are generally viewed as more accountable to the people and independent from the political branches. *Id.* at 92:21–93:10. The interests served by the challenged system thus mirror the interests that the *LULAC* court identified in upholding countywide elections of district judges. 999 F.2d at 869.

Severing the link between the electoral and jurisdictional bases of the State's statewide appellate judges would upend Texas's long-established judicial model. In the process, Supreme Court justices and Court of Criminal Appeals judges would no longer be elected by all voters subject to the high courts' jurisdiction. And, of course, that restructuring would only extend to a segment of the State's judiciary. The link would remain—as enshrined in the Constitution—for other trial and appellate judges whose electoral bases are coterminous with their jurisdiction. *See* TEX. CONST. art. V,

§ 6(a), (b) (Courts of Appeals); *id.* §§ 7, 8 (district courts); *id.* §§ 15, 16 (county courts).

Imposing single-member districts on Texas's highest courts would also threaten to undermine judicial independence and the original concept of separating powers between the branches of government. In the current system, Supreme Court and Court of Criminal Appeals members are largely independent of the Legislature. A single-member system would need to incorporate provisions for reapportioning districts, including dictating when, how, and by whom any redistricting would be conducted. *See, e.g.*, TEX. GOV'T CODE § 22.201 (setting out composition of courts of appeals districts); TEX. CONST. art. V, § 7a (creating Judicial Districts Board to reapportion State's judicial districts). To the extent those decisions are assigned to the Legislature, it could allow legislators to utilize the redistricting process to have a greater influence on the election of the State's high-court members.[9]

### 3. That the Supreme Court and Court of Criminal Appeals are multi-member bodies does not alter the analysis.

Plaintiffs have maintained that the linkage interest does not apply equally— or at all—to "multimember collegial bodies." Trial Tr. 21:22–25 (Feb. 15, 2018) (closing argument). In support, they cite a portion of *LULAC* distinguishing between trial and appellate judges. *Id.* There, in discussing the State's "distrust of judicial subdistricts," the Fifth Circuit noted that appellate judges "make decisions in groups"

---

[9] In addition, Plaintiffs' proposed single-member districting scheme conflicts with State's authority to "define[ ] itself as a sovereign," including the "structure of its government . . . and the character of those who exercise government authority." *Gregory*, 501 U.S. at 460; *see also LULAC*, 999 F.2d at 873 (concluding that "a State's constitutional prerogatives" include "the establishment and operation of its own government" (citations and quotation marks omitted)). There is no evidence to support overriding the State's constitutional authority in this realm.

and "[w]hen collegial bodies are involved, all citizens continue to elect at least one person involved in making a particular decision." *LULAC*, 999 F.2d at 873. But the *LULAC* court did not say—nor, given that the challenge involved district judges, would it have had a basis to say—that the linkage interest was insubstantial for appellate judges. The court's analysis suggests the opposite:

- The long "tradition" of linking district judges' jurisdictional and electoral bases applies equally to Texas's highest appellate courts. *Compare id.* at 868–69, 872, *with* Trial Tr. 97:14–19, 103:6–21 (Feb. 14, 2018) (Ariens).

- Linkage ensures that statewide appellate judges—like district judges— "remain accountable to the range of people within their jurisdiction." *LULAC*, 999 F.2d at 869.

- As with trial judges, a broad electoral base for statewide appellate judges "diminishes the semblance of bias and favoritism towards the parochial interests of a narrow constituency." *Id.*

- In much the same way as it does for trial judges, linkage furthers Texas's "substantial interest in defining the structure and qualifications" of its high-court members. *Id.* at 872.

In any event, this Court need not decide here precisely how much weight to assign the linkage interest relating to appellate judges. Nor must it identify those circumstances where the State's interest may *not* defeat Section 2 liability. Even if Plaintiffs' vote-dilution evidence had been "marginal" (it was not), the Court need only find—consistent with *LULAC*—that Plaintiffs have not presented sufficient evidence of legally significant racially polarized voting to prevail on their claim.

## B.   There Has Been Significant Minority Representation on the Challenged Courts Over the Last Three Decades.

The totality-of-the-circumstances inquiry also includes consideration of "the extent to which members of the minority group have been elected to public office in

the jurisdiction." *Gingles*, 478 U.S. at 37 (citing S. Rep. No. 417, at 28–29). Hispanics and African-Americans have been elected to both of the challenged courts.

For thirty of the last thirty-three years, there has been at least one Hispanic justice on the Supreme Court. DX-22. Raul Gonzalez became the first Hispanic justice in October 1984, later winning three elections before retiring in December 1998. DX-3 at 6; DX-18 at 7; DX-21 at 30, 34. In addition, David Medina was appointed to the Court in November 2004 and served there for eight years. DX-3 at 6; DX-11 at 7. Eva Guzman has served on the Court since October 2009, winning election to full terms in 2010 and 2016. DX-3 at 12; DX-4 at 7–8; DX-8 at 8. In 2016, Justice Guzman received the most votes of any candidate in Texas history. DX-40 at 4. Of the fifteen individuals appointed to the Court from 1996 to 2016, four are Hispanic. DX-42.

From 2001 to 2013, there was at least one African-American justice on the Texas Supreme Court. Wallace Jefferson was appointed in March 2001, served as a justice until September 2004, and then served as chief justice until his resignation in October 2013. DX-3 at 3, 6; DX-9 at 6; DX-11 at 6; DX-13 at 8. Dale Wainwright was elected in 2002 and reelected in 2008. DX-3 at 10; DX-9 at 6–7; DX-13 at 8. Justice Wainwright served on the Court until his resignation in September 2012. DX-3 at 10.

Elsa Alcala was appointed to the Court of Criminal Appeals in May 2011. DX-2 at 3. Judge Alcala was elected to a full term in 2012. DX-7 at 9. Judge Alcala is one of only two individuals appointed to the Court of Criminal Appeals from 1996 to 2016. DX-42. Before that, Fortunato Benavides served on the court from May 1991 to December 1992. Trial Tr. 140:1–4 (Feb. 12, 2018) (Juarez); DX-19 at 6. In 1990,

Morris Overstreet became the first African-American elected to the Court of Criminal Appeals, serving on the court until 1998. DX-16 at 7; DX-19 at 6; DX-21 at 38.

### C.    The Totality-of-the-Circumstances Analysis Must Take Into Account the Pool of Eligible High-Court Candidates.

The Fifth Circuit's en banc decision in *LULAC* establishes that the proportion of elected minority judges must be measured against the proportion of minority lawyers eligible for election, not the proportion of eligible minority voters. The court explained that under *Gingles*'s "'functional view of the political process,'" it was necessary to "recognize the impact of limited pools of eligible candidates on the number of minority judges that has resulted." *LULAC*, 999 F.2d at 865 (quoting *Gingles*, 478 U.S. at 45). Applying that standard, the Fifth Circuit focused its analysis on the percentage of *eligible lawyers* who were minorities, not the percentage of *voters* who were minorities. *Id.* at 865–66. In five of the nine challenged counties, the percentage of minority district judges exceeded the percentage of eligible minority lawyers; in the other four counties, there were no minority judges and a "very small" number of eligible candidates. *Id.* The "absence of eligible candidates [went] a long way in explaining the absence of minority judges," and the plaintiffs could not "emphasize the scarcity of successful minority candidates to support the inference of dilution." *Id.* at 866. To that end, the en banc majority cited each county's eligible-candidate percentages in its vote-dilution analysis. *Id.* at 865–66, 877–93.

Here, the proportion of Texas Supreme Court and Court of Criminal Appeals members who are Hispanic is higher than the proportion of Hispanic lawyers eligible for election to either court. Since January 2013, there has been one Hispanic justice

31

on the Supreme Court (11.1% of the Court). *See* DX-3 at 12. Before then, there were two Hispanic justices from October 2009 to December 2012 and one Hispanic justice for nearly the entire 25-year period from October 1984 to October 2009. *See id.* at 6–7, 12. Since May 2011, there has been one Hispanic judge on the Court of Criminal Appeals. *See* DX-2 at 3. As of December 31, 2016, approximately 9% of attorneys with active Texas law licenses identify as Hispanic or Latino. DX-31 at 1. Of those attorneys with active Texas law licenses and more than ten years of licensure, approximately 7% identify as Hispanic or Latino. DX-33. This evidence helps defeat Plaintiffs' claim that minorities enjoy less opportunity to participate in the political process in Texas. *See* 52 U.S.C. § 10301(b); *Gingles*, 478 U.S. at 36–37.

### D.   Minorities Have Been Actively Recruited to Seek Statewide Judicial Offices.

In *LULAC*, the en banc majority rejected the contention that political parties in Texas were mere "proxies for race or ethnicity" because both parties had supported minority candidates. 999 F.2d at 861. Applying a "functional" review of Texas judicial elections, the court noted that "both political parties, and especially the Republicans, aggressively recruited minority lawyers to run on their party's ticket." *Id.*

The same is true here. Testimony from Judge Elsa Alcala, Justice Gina Benavides, and Justice Linda Yanez shows that each was actively recruited by Republicans to seek statewide judicial office. Judge Alcala accepted an appointment to the Court of Criminal Appeals and was later elected to the court as a Republican. Trial Tr. 230:25–231:3; 272:9–12, 272:24–273:1 (Feb. 12, 2018) (Alcala). The other two judges declined to seek or accept a gubernatorial appointment because they did

not want to run for office as Republicans. Trial Tr. 74:21–75:9 (Feb. 14, 2018) (Benavides); Trial Tr. 174:9–21 (Feb. 14, 2018) (Yanez). Justice Benavides and Justice Yanez instead ran for the Supreme Court as Democrats. DX-6 at 9; DX-9 at 7; DX-13 at 7–8. They both lost—along with all other Democrats seeking statewide office those years—but they received more votes than white Democratic statewide candidates the same year. DX-6 at 8–10; DX-9 at 6–7; DX-13 at 6–8.

### E. Plaintiffs' Totality-of-the-Circumstances Experts Should Be Given No Weight.

At trial, Plaintiffs offered two experts to opine on matters relating to the totality of the circumstances. Neither witness's testimony supports Plaintiffs' efforts to prove that the challenged system results in vote dilution on account of race or color.

The first expert, Professor Juarez, testified regarding Texas's linkage interest and the history of the challenged courts. Professor Juarez's linkage-interest analysis is impermissible legal-opinion testimony, so it need not be given any weight. *See supra* n.6; ECF No. 65. His historical analysis should similarly be disregarded. To begin, this is not an intentional-discrimination case, so his testimony about the intent behind the adoption of the challenged system is irrelevant. *See, e.g.*, Trial Tr. 119:12–120:21 (Feb. 12, 2018) (Juarez). Moreover, Professor Juarez presented a skewed review of the success rate of Hispanic incumbents on the Supreme Court, as he chose to cover only 2002 to 2016. *Id.* at 186:3–8. If Professor Juarez had included the preceding two decades in his analysis, he would have captured Raul Gonzalez's three election victories (1986, 1988, and 1994); Alberto Gonzales's election in 2000; and four losses by white incumbents in the 1980s and 1990s. *Id.* at 185:12–187:14. Professor

Juarez's selective analysis does nothing to advance Plaintiffs' vote-dilution claim.

So too for Dr. Henry Flores. He admitted to making numerous errors in his analysis. *E.g.*, Trial Tr. 30:13–18, 49:23–50:1, 99:16–100:5 (Feb. 13, 2018) (Flores). His testimony was filled with conclusions that lacked any legitimate support and were instead based on his "perception" from utilizing a "qualitative method" and "haphazard" interview sampling. *Id.* at 62:10–21, 70:8–74:10, 98:13–17, 99:9–11. What is more, Dr. Flores failed to identify any link between past incidents of alleged discrimination and any current socioeconomic differences. And his "perspective" includes claiming that the U.S. Supreme Court's majority opinion in *Shelby County v. Holder*—in which Justice Clarence Thomas joined—was written by "five white men" who hold "pro-white supremacy" beliefs. *Id.* at 67:15–69:7.

## V.    PLAINTIFFS LACK STANDING TO CHALLENGE TEXAS'S METHOD OF ELECTING SUPREME COURT JUSTICES AND COURT OF CRIMINAL APPEALS JUDGES.

All of this presupposes that Plaintiffs have standing in this suit. But the evidence does not support a finding that any Plaintiffs have suffered an injury-in-fact traceable to the challenged electoral system.

None of the individual plaintiffs has standing. To begin, four of them (Lionel Lopez, Arlene Lira Easter, Alicia Benavidez, and Andres Rosas) did not testify at trial. So there is nothing in the record to prove that these individuals satisfy Article III standing requirements. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (facts supporting standing "must be supported adequately by the evidence adduced at trial" (quotation marks omitted)). That is also true for the plaintiffs who testified (Isabel Araiza, Lena Lorraine Lozano Solis, and Carmen Rodriguez). None

of these individuals demonstrated a "concrete and particularized" injury attributable to Texas's method of electing statewide appellate judges. *See id.* at 560; *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) (precluding standing based on "a generalized grievance shared in substantially equal measure by all or a large class of citizens"). Nor is there evidence to show that single-member districting would redress their purported injuries. *See Lujan*, 504 U.S. at 561; *supra* Part II.B.

LUPE, the organizational plaintiff, fares no better on standing. The group lacks associational standing because there is no evidence that any of its members would have standing to sue in their own right or that the interests that LUPE seeks to protect here are germane to its purpose. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Nor does the record support LUPE's standing to sue on its own behalf based on a "diver[sion of] significant resources to counteract" the challenged system. *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010); *see* Trial Tr. 50:4–51:1 (Feb. 12, 2018) (Valdez Cox).

## CONCLUSION

Plaintiffs have not proven that the statewide election of Texas Supreme Court justices and Court of Criminal Appeals judges has diluted the right of Hispanic citizens to vote on account of race or color. Nor can Plaintiffs overcome the State's substantial interest in linking the jurisdictional and electoral bases of its appellate judiciary. Defendants are entitled to judgment.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

/s/   *Patrick K. Sweeten*
PATRICK K. SWEETEN
Attorney-in-Charge
Senior Counsel for Civil Litigation
Tx. State Bar No. 00798537
Southern District of Texas No. 1829509
Tel.: (512) 463-4139; Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov

ADAM N. BITTER
Assistant Attorney General
General Litigation Division
Tx. State Bar No. 24085070
Southern District of Texas No.2167538
Tel.: (512) 475-4055; Fax: (512) 320-0667
adam.bitter@oag.texas.gov

TODD LAWRENCE DISHER
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 936-2266; Fax: (512) 936-0545
todd.disher@oag.texas.gov

P.O. Box 12548
Austin, Texas 78711-2548

***Counsel for Defendants***

36

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of March, 2018, the foregoing *Defendants'* *Post-Trial Brief* was electronically filed with the Clerk of the Court using the CM/ECF system and served on all attorney(s) and/or parties of record, via the CM/ECF service and/or via electronic mail.

<u>/s/   *Patrick K. Sweeten*         </u>
PATRICK K. SWEETEN
Senior Counsel for Civil Litigation