United States District Court
Southern District of Texas
**ENTERED**
September 12, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LIONEL LOPEZ, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:16-CV-303 |
| | § | |
| GREG ABBOTT, *et al*, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs challenge statewide, at-large elections of all justices to the Supreme Court of Texas and judges to the Texas Court of Criminal Appeals under Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301. They allege that at-large voting has diluted the voting strength of registered voters who are Hispanic. To remedy this, they request that the Court order the imposition of single member districts to be drawn up, in the first instance, by the Texas legislature.

This action was tried to the bench from February 12 to 15, 2018. For the reasons set out below, the Court holds that three of the individual Plaintiffs and Plaintiff La Unión Del Pueblo Entero (LUPE) have standing. The Court holds that Plaintiffs have satisfied the three preconditions set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986). However, under the totality of the circumstances test, they have failed to satisfy their burden of demonstrating that the lack of electoral success by Hispanic-preferred candidates for high judicial office is on account of race rather than other factors,

including partisanship.  Thus, they have not demonstrated a Section 2 violation and they are not entitled to relief.

## STANDING

The Court begins by addressing whether Plaintiffs have standing to bring their suit.  A plaintiff seeking to establish Article III standing must show "that he '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).  The injury in fact must involve the "'invasion of a legally protected interest' that is 'concrete and particularized,' *i.e.,* which 'affect[s] the plaintiff in a personal and individual way.'"  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 & n.1 (1992)) (alterations in original).

**Individual Plaintiffs.**  Beginning with the seven individual Plaintiffs,[1] it is settled that "voters who allege facts showing disadvantage to themselves as individuals have standing to sue."  *Baker v. Carr*, 369 U.S. 186, 206 (1962).  Here, three of the Plaintiffs—Isabel Araiza, Lena Lorraine Lozano Solis, and Carmen Rodriguez—testified that they are of Hispanic descent and that they vote regularly.  They also all reside in parts of Texas that are within the proposed Hispanic-majority districts under Plaintiffs' illustrative redistricting schemes.  Each of these Plaintiffs has therefore demonstrated an

---

[1]  Those Plaintiffs are Lionel Lopez, Isabel Araiza, Arlene Lira Easter, Alicia Benavidez, Andres Rosas, Lena Lorraine Lozano Solis, and Carmen Rodriguez.

injury-in-fact, traceable to Texas's method of selecting high-court justices and judges, which may be remedied through this litigation.  This is sufficient to establish standing.

The same cannot be said for the four Plaintiffs who did not testify,[2] as "[t]he facts necessary to establish standing . . . must not only be alleged at the pleading stage, but also proved at trial."  *See Gill*, 138 S. Ct. at 1931.  No such evidence was presented as to these Plaintiffs.  Plaintiffs cite *Crawford v. Marion County Election Board*, 553 U.S. 181, 189 n.7 (2008), for the proposition that the court need not examine whether all plaintiffs have standing so long as one plaintiff demonstrates standing.  *Crawford*, however, was decided on summary judgment, where it makes sense to proceed to overarching questions of liability after determining that any single plaintiff can establish standing.  Here, the burden at trial was on each Plaintiff to demonstrate his or her actual injury in fact.  That burden was not met for the non-testifying Plaintiffs, who for that reason are dismissed.

**LUPE.**  Also joining as a Plaintiff is the organization LUPE.  Founded by César Chávez and Dolores Huerta in 1989 as a means to improve the lives of farmworkers, LUPE is a non-profit, non-partisan organization of more than 7,000 members, many of whom are Hispanic voters residing in Texas.

A three-part test is used to determine whether an organization such as LUPE may establish standing.  Under that test, an organization "has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual

---

[2] Those Plaintiffs are Lionel Lopez, Arlene Lira Easter, Alicia Benavidez, and Andres Rosas.

members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

That test is met.  According to testimony from LUPE executive director Juanita Valdez-Cox, LUPE's members include voters who reside in the heavily Hispanic areas of South and West Texas where the alleged dilutive effects of statewide judicial elections are felt most keenly.  The interests at stake are also germane to LUPE's mission of promoting political engagement among its members, which LUPE furthers by encouraging voter registration and hosting events at which candidates for elected office, including judicial office, are invited to appear.  Finally, the nature of the requested relief does not require every LUPE member to participate in the case.

For these reasons, LUPE and Plaintiffs Isabel Araiza, Lena Lorraine Lozano Solis, and Carmen Rodriguez have standing.  The Court turns next to the merits of their claims.

## STANDARD OF REVIEW

Recurring throughout this case are incorrect assertions—from both sides—as to the parties' relative burdens of proof.  At the heart of the confusion are two issues:  (1) a failure to separate the different purposes of, and properly apply, the *Gingles* preconditions analysis and the *Gingles* totality of circumstances test; and (2) a loose extrapolation of Fifth Circuit opinions, *LULAC*[3] and *Teague*[4], beyond their respective holdings.  The Court has examined *Gingles* and its progeny at some length and will adjudicate this case pursuant to the untangled burdens of proof described below.  The

---

[3] *League of United Latin Am. Citizens (LULAC) v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc).
[4] *Teague v. Attala Cnty., Miss.*, 92 F.3d 283 (5th Cir. 1996).

Court will further interpret the holdings in *LULAC* and *Teague* in the context of their respective factual records.

## I.  Burden of Proof on Plaintiffs' Claims

Plaintiffs' entitlement to Section 2 relief—as it applies to this case—requires showing vote dilution on account of race.  Vote dilution is a question of fact subject to the clearly-erroneous appellate standard of review of Federal Rule of Civil Procedure 52(a).  *Gingles*, 478 U.S. at 78; *Teague*, 92 F.3d at 287.  The evidence relevant to its determination "must be made over time and over the course of many elections.  How many elections must be studied to make this determination depends on the particular circumstances of the locale."  *Teague*, 92 F.3d at 288-89 (citing *Gingles*, 478 U.S. at 57 n.25).  The factors to be considered in a racially-correlated vote dilution case based on the use of a multimember district are well-established and undisputed.  They are derived from *Gingles*, 478 U.S. at 50–51, which sets out three preconditions and a test based upon the totality of the circumstances.

### A.  The *Gingles* Preconditions

Plaintiffs must first "offer evidence of the circumstances of the local political landscape—evidence demonstrating that 'its members have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice.'"  *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1146 (5th Cir. 1993) (quoting Section 2).  The Supreme Court set out the three preconditions for proving vote dilution as follows:

- "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."

- "Second, the minority group must be able to show that it is politically cohesive."

- "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate."

*Gingles*, 478 U.S. at 50-51 (citations omitted).  While the preconditions are not applied in isolation, plaintiffs must prove each of them by a preponderance of the evidence. *Magnolia*, 994 F.2d at 1146.

The First Circuit has summarized the function of the different elements of the *Gingles* inquiries.  "The first two *Gingles* preconditions look to whether, putting the challenged practice, procedure, or structure to one side, minority voters within a given constituency have the potential to elect representatives of their choice."  *Uno v. City of Holyoke*, 72 F.3d 973, 979 (1st Cir. 1995).  "The third *Gingles* precondition . . . addresses whether the challenged practice, procedure, or structure is the cause of the minority group's inability to mobilize its potential voting power and elect its preferred candidates."  *Id.* at 980.  "Proof of all three preconditions creates an inference that members of the minority are in fact harmed by the challenged electoral practice, procedure, or structure. However, the inference is rebuttable."  *Id.*  The totality of circumstances test is the means by which the inference of vote dilution may be rebutted or cemented.  *Id.*; *see also Teague*, 92 F.3d at 292.

## B.  The *Gingles* Totality of Circumstances Test

Section 2 relief is justified when the voting methodology "results in a denial or abridgement of the right of any citizen of the United States to vote ***on account of race or color*** . . . ." 52 U.S.C. § 10301(a) (emphasis added).  The court must balance a number of considerations to determine whether there is unlawful vote dilution under the totality of the circumstances.  Those factors include:

1.  The history of official discrimination in voting;

2.  Racial polarization of elections;

3.  Voting practices that enhance the potential for discrimination against minorities;

4.  Exclusive slating processes;

5.  The social, educational, and financial legacy of discrimination that hinders effective minority participation in the political process;

6.  Racial appeals in elections;

7.  The number of minorities elected to public office;

8.  Elected representatives' lack of responsiveness to the minority's particularized needs; and

9.  Whether the reasoning for imposing the challenged voting methodology is tenuous.

*Gingles*, 478 U.S. at 37-38.  These issues present questions of fact for the court.  *Salas v. Sw. Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992).

### C.  Relationship Between Preconditions and Totality of Circumstances

With respect to the interaction between the three preconditions and the nine factors relevant to the totality of circumstances test,

> [I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances.  In such cases, the district court must explain with particularity why it has concluded, under the particular facts of that case, that an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act.

*Clark v. Calhoun Cty., Miss.*, 21 F.3d 92, 97 (5th Cir. 1994) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir.1993)).  The *Clark* case notes that it will be unusual for the fact of minority vote dilution to be unrelated to racial bias, but separating the two tests—the three preconditions and the totality of circumstances— ensures that the evidence supports both and that relief is not granted where they are not both tethered.  The "unusual case" that *Clark* refers to is a case, like *LULAC*, where the racial minority is closely aligned with the losing political party and the evidence on the totality of circumstances renders political partisanship the better explanation for the defeat of minority-preferred candidates at the polls.  *LULAC*, 999 F.2d at 859-60.

### II. Burden of Proof on Defensive Issues

While offering evidence on several of the factors to be considered, the State has defended this action on the basis of two main themes:  (1) the electoral results represent partisan defeats, not voter dilution; and (2) the State has an insurmountable linkage interest in having all of the high court justices and judges elected on a statewide basis.

Because these two themes are so prominently featured in this case and because the parties have advocated for the application of equally extreme, yet opposing, burdens of proof, the Court must determine at the outset where those burdens on defensive issues lie and what standard of proof must be met.

### A. Partisan Politics

Plaintiffs argue that, if they have demonstrated racially polarized voting, "the burden then shifts to the defendant to prove that a race-neutral reason is the cause of the polarization" with a burden to demonstrate that "the record *indisputably* proves that partisan affiliation, *not race*, best explains the divergent voting patterns." D.E. 102, pp. 32-33 (quoting *LULAC,* 999 F.2d at 850 (emphasis Plaintiffs') and *Teague*, 92 F.3d at 290). However, those cases did not articulate such an all-or-nothing test. And that test is contrary to the nine-factor totality of the circumstances balancing test arising out of both the Senate Report[5] compiled when Congress amended Section 2 and the *Gingles* opinion that enunciated the new test. An evaluation of the *LULAC* and *Teague* opinions in the context of their respective evidentiary records makes this clear.

The *LULAC* opinion considered the issue of race versus partisanship at significant length. 999 F.2d at 849-63. The trial court had refused to consider nonracial causes of voting outcomes. On appeal, the defendants argued that—to support a vote dilution case—white bloc voting must be analyzed with respect to evidence of considerations alternative to racial bias, such as partisanship. The Fifth Circuit agreed. Citing

---

[5]   S. Rep. No. 417 (1982), *reprinted in* 1982 U.S. C.C.A.N. 177.

*Whitcomb v. Chavis*[6] and *White v. Regester*,[7] the *LULAC* court discussed the interaction between polarized voting and the other factors affecting minority access to the political system.  Without diminished minority access, a vote dilution claim is a "mere euphemism for political defeat at the polls."  999 F.2d at 854 (quoting *Whitcomb*, 403 U.S. at 153).

The *LULAC* opinion does not support Plaintiffs' representation that they have shifted the burden of proof and that it is up to the State to prove that partisanship indisputably explains the evidence that Plaintiffs interpret as demonstrating voter dilution.  The *LULAC* decision is inextricably tied to its evidence:

> It is difficult to see how ***the record in this case*** could possibly support a finding of liability under the approach outlined in the Senate Report.  ***Plaintiffs have not even attempted to establish proof of racial bloc voting by demonstrating that "race,"*** not, as defendants contend, partisan affiliation***, "is the predominant determinant of political preference."***  They have instead maintained in the very teeth of the Senate Report, that such a showing is unnecessary.  Because the district court accepted this argument, the test employed at trial enabled plaintiffs to prevail by proving little more than a lack of success at the polls and a history of discrimination.

999 F.2d at 855 (emphasis added).

The Fifth Circuit discussion of the race-versus-partisanship issue includes some support for the idea that plaintiffs have the burden to distinguish racially polarized voting from partisan voting patterns by reference to the other factors in the totality of the circumstances test.  However, the court refused to articulate a burden of proof.  "[W]e need not resolve the debate today.  Whether or not the burden of the plaintiffs to prove

---

[6]  403 U.S. 124 (1971).

[7]  412 U.S. 755 (1973).

bloc voting includes the burden to explain partisan influence, the result is the same.  This is so even if the partisan voting is viewed as a defensive parry."  999 F.2d at 860.

In the end, the *LULAC* court found, as a matter of fact, "Because the evidence in most instances unmistakably shows that divergent voting patterns among white and minority voters are best explained by partisan affiliation, we conclude that plaintiffs have failed to establish racial bloc voting in most, but not all, of the counties."  999 F.2d at 861.  The fact that the record made it "unmistakable" there does not mean that the burden falls on a defendant to show that it is "unmistakable" in every case.  By the same token, "Plaintiffs are . . . entirely correct in maintaining that courts should not summarily dismiss vote dilution claims in cases where racially divergent voting patterns correspond with partisan affiliation as 'political defeats' not cognizable under § 2."  999 F.2d at 860-61.  In sum, the *LULAC* opinion calls upon the court to look at all of the evidence regarding each of the factors to determine whether racial bias or partisan politics better explains the voting patterns.

The *Teague* opinion did not change the analysis.  That opinion notes that plaintiffs do not bear the burden in the first instance to eliminate factors other than race as influencing voters.  *Teague*, 92 F.3d at 290.

> Plaintiffs are to present evidence of racial bias operating in the electoral system by proving up the *Gingles* factors. Defendants may then rebut the plaintiffs' evidence by showing that no such bias exists in the relevant voting community. . . . The lack of evidence in the record on this point favors the plaintiffs, not the defendants.

*Id*.  In the absence of evidence that other issues explain minority electoral defeat, some evidence of racial bias in voting will satisfy plaintiffs' burden.

*LULAC* involved indisputable and unmistakable evidence of a factor other than racial bias influencing voting.  *Teague* involved the opposite—no evidence of any other factor at all.  Those are the two extremes, and as such they do not articulate the entirety of the relevant burden of proof.  Consistent with *Gingles*, the Court holds that Plaintiffs have the duty, in the first instance, to demonstrate some evidence of racial bias through the factors used in the preconditions and totality of circumstances test.  Upon doing so, the burden shifts to the State to demonstrate some evidence of partisan politics (or some other issue) influencing voting patterns.  If the State does so, then the Court must balance the relative strength of the evidence directed to each of the totality of circumstances factors to determine whether racial bias best explains the alleged vote dilution.

### B.  Linkage

A voting methodology that correlates the jurisdiction of the elected official with his or her constituency is expressive of the State's linkage interest.  The reasoning behind linkage is to promote the State's substantial interest in judicial effectiveness by balancing accountability and independence.  *LULAC*, 999 F.2d at 868-69.  The weight of such a substantial state interest is a question of law.  *Id*. at 868, 871.  In a Section 2 case, the court must balance that interest against localized evidence of racial vote dilution.  *Id*.

The Fifth Circuit expressly rejected the extremes "that the linkage interest either always or never defeats § 2 liability."  *Id*. at 871 (quoting *Houston Lawyers' Ass'n v. Attorney Gen. of Texas*, 501 U.S. 419, 427 (1991)).  Thus linkage does not automatically

wield dispositive weight, but is part of the totality of circumstances balancing test.  It will fall only to substantial proof of racial vote dilution.  *Id*. at 868-71.  Plaintiffs must produce evidence of racial dilution in voting pursuant to the factors of the totality of circumstances test.  If the state raises the linkage interest, the court determines the weight of that interest as a question of law and then balances that, along with the other factors, to determine if racial dilution, rather than an appropriate state interest in linking an elected official with the office's constituency, explains the alleged Section 2 violation.

### III.    Summary

Despite the parties' claims to the contrary, they have advanced no single dispositive issue or burden of proof that bypasses the need to work through all of the *Gingles* elements.  Therefore, the Court will first determine whether Plaintiffs have met the three *Gingles* preconditions.  If so, the Court will then consider whether Plaintiffs have produced some evidence of racial bias in the electoral system in the factors of the totality of circumstances test.  If so, the Court considers whether the State has advanced alternative explanations.  If so, the Court will find as a matter of fact or law—as required for each interest—the weight to be accorded each issue, including partisan politics and linkage.  After doing so, the Court will balance the resulting factors against each other to determine whether, on the whole, Plaintiffs as Hispanic voters have had their voting power for electing judges and justices of Texas's high courts diluted on account of race.

## DISCUSSION

### I. Facts

The record is largely comprised of public records related to Texas statewide election contests and precinct voting patterns, as well as expert statistical analysis of those records. Demographic data, extracted and compared against the election results, reveal how different racial groups have voted in recent years. The underlying evidence, methodologies for analysis, and ultimate statistical results are not disputed. Rather, the controversy of this case relates to whether certain contests, particularly party primaries and those in which the candidates are not racially diverse, are probative on the question of voter dilution. That statistical information, the anecdotal accounts, and other evidence will be discussed in the context of the legal issues to which they relate.

### II. *Gingles* and Section 2

It is well understood that Section 2 does not provide an assurance of success at the polls for minorities. *Johnson v. De Grandy*, 512 U.S. 997, 1013-14 n.11 (1994). What it seeks to provide is an assurance of fairness. *Uno*, 72 F.3d at 979. "Thus, when 'a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives,' a section 2 claim lies." *Id.* (citing *Gingles*, 478 U.S. at 47). The *Gingles* preconditions are designed to demonstrate whether the electoral structure is such that minority votes are consistently defeated. The totality of circumstances test is designed to show whether that result is a matter of race-based dilution or some other phenomenon.

14

### A. Discussion of Preconditions

#### 1. Minority-Majority District

The first *Gingles* precondition "requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans." *Gonzalez v. Harris Cty., Tex.*, 601 F. App'x 255, 258 (5th Cir. 2015) (per curiam). Such a plan is not proposed as a final remedy, but as a feasible alternative. *Clark*, 21 F.3d at 95. It must demonstrate that the minority population exceeds fifty percent (50%) of Citizen Voting Age Population (CVAP) in an illustrative single-member district. *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853 (5th Cir. 1999); *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997).

Plaintiffs offered the testimony of Dr. Lisa Handley,[8] who had drawn up two hypothetical single-member district plans. One divided the state into nine districts on the premise that each of the nine judges and justices for the respective courts would be elected in a separate single-member district. PTX 128. The other plan divided the state into eight districts, on the premise that only eight of the judges or justices would be elected in single-member districts and the chief judge or justice would be elected at large. PTX 129.

Each of Dr. Handley's plans created two minority-majority districts along the southern border of the state. With respect to CVAP, each reflects Hispanic CVAP

---

[8] Dr. Handley is a political scientist who works as an election consultant in the United States and internationally. In the United States, she concentrates her work on Section 2 issues, such as redistricting and minority vote dilution. 2 Tr. 135. She has utilized her expertise on behalf of state and county jurisdictions, along with the U.S. Department of Justice. *Id.* at 136-37. The State did not object to Dr. Handley testifying as an expert witness. 2 Tr. 141-42.

comfortably over 50%.  The nine-district map lists districts 2 and 3 with Hispanic CVAP of 59.69% and 59.19%, respectively.  2 Tr. 146-47.  The eight-district map lists districts 1 and 8 with Hispanic CVAPs of 55% and 58%.  2 Tr. 152.

The proposed districts also comply with the principle of one person, one vote because the population of each illustrative district did not vary more than 2% from the ideal number achieved by dividing total CVAP by the number of districts created.  2 Tr. 149.  The Supreme Court has held that deviations up to 10% of mathematical equality are permissible, as population counts are inexact snapshots and other considerations (such as administrative integrity and contiguity) may be of sufficient importance to justify minor deviations.  *Brown v. Thomson*, 462 U.S. 835, 842 (1983).  All of the districts are contiguous and follow administrative (county) boundaries with the exception of the districts that bisect Harris County.  2 Tr. 148-49.  Dr. Handley explained that Harris County was too populous to be placed in any single district.  2 Tr. 149.  Thus, its separation was a statistical necessity rather than a strategic choice.

The State argued that Plaintiffs' proof was insufficient because they did not show that the two majority-minority districts will, in fact, result in the election of minority-preferred candidates.  As Plaintiffs point out, no such requirement is stated in *Gingles*. The plans need only be illustrative.  *See Valdespino*, 168 F.3d at 852-53.  Whether the districts would actually perform effectively is a question that can be considered at the remedial phase. *Johnson,* 512 U.S. at 1013-14 & n.11; *Pope v. Cty. of Albany*, 687 F.3d 565, 576 (2d Cir. 2012).  It is not an element of proving liability.  *Dickinson v. Indiana State Election Bd*., 933 F.2d 497, 503 (7th Cir. 1991) (citing *Gingles*, 478 U.S. at 50–51);

*Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006); *Nipper v. Smith*, 39 F.3d 1494, 1532-33 (11th Cir. 1994) (en banc).

The hypothetical plan must also show that the minority group is geographically compact under traditional redistricting principles. *Abrams v. Johnson*, 521 U.S. 74, 92 (1997); *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 669 (5th Cir. 2009). Dr. Handley testified to the compact nature of her plans. 2 Tr. 151:7-11. The single-member districts are contiguous (each district is a single connected piece), follow existing administrative boundaries (counties), and should take into consideration any known communities of interest. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006).

The State did not offer a controverting expert analysis of Dr. Handley's maps. Instead, it challenged Dr. Handley's analysis on three bases: (1) failure to consider communities of interest; (2) failure to apply objective measures of compactness; and (3) *ipse dixit*. The first two issues are components of an overall determination of whether the plans comport with traditional redistricting principles: "Such principles include, *inter alia*: compactness, contiguity, and respect for political subdivisions; avoiding contests between incumbent representatives; not disrupting preexisting electoral minority-opportunity districts; and maintaining communities of interest and traditional boundaries." *Gonzalez*, 601 F. App'x at 259 (citations omitted).

Any variation in districting plans will, by necessity, value some principles over others. Thus, the objective of a challenge is to show that the legitimate political objectives sought are comparably consistent with these principles. *Id*. It is the Court's unwelcome task to make this imprecise determination. The Court FINDS on this record

17

that the challenges to Plaintiffs' illustrative plans are insufficient to defeat the first precondition.

**Communities of Interest**.  It is true that Dr. Handley did not testify as to whether her illustrative single-member district plans interfered with, or accommodated, separate communities of interest.  And although the State questioned her about the size of the districts and the various regions and cities that were combined or separated by the districts drawn in the demonstrative map, there was no evidence regarding what communities of interest might have existed and whether they were improperly combined or separated.  3 Tr. 17-20.  Neither has the State cited any authority for a holding that silence on this consideration is fatal to proof of the first precondition.

Because it is only one factor to be considered on the issue of comportment with traditional redistricting principles, the Court declines to find its omission on this record to be a defect in prima facie proof.  Dr. Handley testified credibly as to having successfully accommodated interests of compactness, contiguity, and respect for political subdivisions, all of which are legitimate considerations.  Absent evidence that the illustrative plans affirmatively violate a redistricting principle related to communities of interest, the Court rejects the challenge.

**Objective Measures**.  The State suggests that Dr. Handley's illustrative maps and her testimony supporting them are also defective because she did not apply any objective tests that provide a concrete measure of compactness.  *See Rodriguez v. Harris Cty., Tex.*, 964 F. Supp. 2d 686, 740 (S.D. Tex. 2013) (discussing statistical measures of compactness, referring to "area rubber band, perimeter-to-area, and population-rubber

18

band" metrics), *aff'd sub nom.*, *Gonzalez*, 601 F. App'x at 255; *see also Comm. for a Fair & Balanced Map v. Illinois State Bd. of Elections*, 835 F. Supp. 2d 563, 570 (N.D. Ill. 2011) (discussing the Polsby–Popper measure and the Reock indicator).  Yet, the State did not conduct its own objective statistical measure of compactness and has not identified any feature of the illustrative maps that is particularly vulnerable to objections on this basis.

As was the case with the State's objection based on communities of interest, the State faults Plaintiffs for failing to defend their demonstrative maps on a basis that has not been attacked.  And despite the existence of mathematical measures, there is still the "eyeball test" by which the Court may make a visual inspection of the map to determine whether the district is compact or unduly contorted.  *Commission*, 835 F. Supp. 2d at 570. Plaintiffs' maps pass that test.

The Court has reviewed the maps and Dr. Handley's testimony as to how she created them.  The Court is satisfied that the districts are reasonably compact without application of mathematical metrics.  Again, the compactness of the districts is only one factor to be considered in determining whether the maps are consistent with traditional redistricting principles.  The Court rejects the challenge that the failure to calculate objective metrics is dispositive of the first precondition.

***Ipse Dixit***.  Dr. Handley testified that the Hispanic population groups in her single-member districts are sufficiently large and geographically compact as to satisfy the first *Gingles* precondition.  2 TR 151:7-11. The State objects to this testimony as inadmissible *ipse dixit*, devoid of evidentiary value.  *Guile v. United States*, 422 F.3d 221,

19

227 (5th Cir. 2005).  This challenge suggests that her ultimate opinion, stated in the cited reference, was unsupported in the rest of her testimony.  Rather, this opinion testimony was a summation of the evidence she had developed regarding Hispanic CVAP, demographics, voting patterns, and the division of the state into geographic districts. The Court rejects this challenge.

The Court FINDS that Plaintiffs have met the first precondition.  The Hispanic minority group is sufficiently large and geographically compact to constitute a majority in a single-member district.

### 2.  Politically Cohesive Minority

The second and third preconditions are components of the Supreme Court's definition of racially polarized voting, which in turn is—as a single concept—a factor of the totality of circumstances test.  "The purpose of inquiring into the existence of racially polarized voting is twofold:  to ascertain *whether minority group members constitute a politically cohesive unit* and to determine whether *whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates*."  *Gingles*, 478 U.S. at 56 (emphasis added).

> The [trial] court used the term "racial polarization" to describe this [statistically significant] correlation [between the race of the voter and the voter's choice of certain candidates].  It adopted Dr. Grofman's definition—"racial polarization" exists where there is "a consistent relationship between [the] race of the voter and the way in which the voter votes," or to put it differently, where "black voters and white voters vote differently."  We, too, adopt this definition of "racial bloc" or "racially polarized" voting.

*Id*. at 54 n.21.

20

"If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests." *Id.* at 51.  "For purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent.  It means simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates." *Id.* at 62.  Correlation rather than causation is the test because "the reasons black and white voters vote differently have no relevance to the central inquiry of § 2. By contrast, the correlation between race of voter and the selection of certain candidates is crucial to that inquiry." *Id.* at 63.

Therefore, this precondition is proven by statistical evidence that "a significant number of minority group members usually vote for the same candidates." *Id.* at 56.  The preferred candidate need not be a member of the minority group.  *E. Jefferson Coal. for Leadership & Dev. v. Par. of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991).  And the analysis preferably covers a sufficient time to display a consistent pattern of racial bloc voting.  *Gingles*, 478 U.S. at 57 & n.25.  A statistically significant level of cohesion to satisfy this precondition has been found at a level as low as 51%.  *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 710-11 (S.D. Tex. 2017) (51%); *Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *11 (N.D. Tex. Aug. 2, 2012) (54.1%, considered in context with a range of elections with higher cohesion levels).

Dr. Handley performed the necessary statistical analysis using three established techniques:  homogenous precinct analysis, ecological regression, and King's ecological inference.  2 Tr. 156.  *See generally Teague*, 92 F.3d at 290 (there is an "established acceptance of regression analysis as a standard method for analyzing racially polarized voting," citing *Gingles*, 478 U.S. at 52-53 n.20).  She used Texas's Spanish surname database to analyze Hispanic voting preferences in statewide judicial elections.  2 Tr. 160-61.  There was no suggestion that these techniques were infirm.  Rather, the State's expert, Dr. John Alford, used the same tools and reached the same results.  3 Tr. 207, 249-50.

Dr. Handley demonstrated that in 11 of the 13 relevant electoral contests, at least 70% of Latino voters preferred the same candidate.  *E.g.*, 2 Tr. 181.  Dr. Alford produced similar results, although he advocated a higher threshold for finding legally significant minority political cohesion.   3 Tr. 235, 282 (recommending requiring 80 to 90% cohesion).  While Dr. Alford suggested that cohesion levels of 60-70% were too low to be significant, he did not articulate any factual or methodological reason for his opinion and he agreed that Hispanics voted cohesively for their preferred candidate.  3 Tr. 258-60.  His testimony that over 70% was required for compliance with *Gingles* is not corroborated in the briefing.  *See* 3 Tr. 236.

The Court FINDS that Plaintiffs have met the second *Gingles* precondition.  The record demonstrates that the minority group members—Latinos—constitute a politically cohesive unit.

### 3.  Majority Bloc Voting

As with the second precondition, the third *Gingles* precondition is demonstrated through statistical evidence that the submergence of the minority group in a white majority multimember district impedes the minority group's ability to elect its chosen representatives.  *See generally League of United Latin Am. Citizens #4552 (LULAC) v. Roscoe Indep. Sch. Dist.,* 123 F.3d 843, 847 (5th Cir. 1997).  While the results need not show invariable white bloc voting success, white bloc success must be the usual result. *Teague*, 92 F.3d at 288.

> The amount of white bloc voting that can generally "minimize or cancel" black voters' ability to elect representatives of their choice, however, will vary from district to district according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting; the percentage of registered voters in the district who are members of the minority group; the size of the district; and, in multimember districts, the number of seats open and the number of candidates in the field.

*Gingles*, 478 U.S. at 56 (citations omitted).

Dr. Handley used her three statistical techniques to analyze the data.  To get an even better understanding of the white bloc data, she used United States census results in an effort to carve out black voters from the non-Hispanic group, rendering a better comparison of Latinos to white voters.  2 Tr. 211-12.  She again demonstrated that non-Hispanic voters consistently preferred different candidates from those preferred by Hispanics and did so at rates of over 60%.  *E.g.*, 2 Tr. 174.  When she included the census

results, the white bloc voting rate was as high as 84.4% in an election involving candidates from both major parties.  PX 127.

Dr. Alford's analysis did not negate the results Dr. Handley reached.  The pattern of voting demonstrated that white voters often voted as a bloc for a candidate that the minority group opposed.  3 Tr. 212-16.  The difference in Dr. Alford's testimony is that he focused on issues other than the ethnicity of the voters and their preferred candidates—which are the issues relevant to bloc voting.  He instead looked at elections from the point of view of the ethnicity or race of the candidate, suggesting that there was no racial polarization in contests where Hispanic voters voted for the white candidate over the Hispanic candidate.  3 Tr. 213-16.  And he attributed results strictly to partisan preference rather than racial bloc voting.  *Id.*

At this juncture, the Court is only concerned with whether there is a pattern of white bloc voting that consistently defeats minority-preferred candidates.  That analysis requires a determination that the different groups prefer different candidates, as they do.  It does not require a determination of why particular candidates are preferred by the two groups.

The Court FINDS that Plaintiffs have met the third *Gingles* precondition.  Plaintiffs have demonstrated that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances—usually to defeat the minority's preferred candidate.

24

### B.  The Three Preconditions Have Been Met

The State argues that Plaintiffs run afoul of direct Fifth Circuit precedent when their proof on the three preconditions fails to relate their preferred candidates' lack of electoral success to racial bias in the electoral system.  D.E. 108, pp. 8-9, 11 (citing *LULAC*, 999 F.2d at 851, 857).  As addressed in the section on the standard of review, *LULAC* did not assign any racial bias issue to the three *Gingles* preconditions.  The preconditions require showing that there is a racial divide among the voters and that single-member districts would provide the minority group with fair access in contrast to the at-large elections in which white bloc voting consistently defeats their preferred candidate.

The State's argument treats the preconditions as the sum total of Plaintiffs' case. It is not.  Rather, Plaintiffs must still demonstrate that the vote dilution of which they complain is "on account of race." And they still have the totality of circumstances test in which to do so.  Nothing in *LULAC* cabins racial bias issues inside the boundaries of the proof required on the preconditions.  Thus the State is correct that Plaintiffs' case must include evidence of racial bias, but it is not correct that that evidence is part of the *Gingles* preconditions; it is part of the totality of the circumstances test.

Plaintiffs have met all three *Gingles* preconditions.  Thus, they have demonstrated that the at-large system of voting for justices of the Supreme Court of Texas and judges on the Texas Court of Criminal Appeals works to their disadvantage and that it is possible to remedy that disadvantage through single-member districts.  However, they are

not entitled to relief unless they also show that, under the totality of the circumstances, their electoral disadvantage is "on account of race," as discussed below.

### III.     Totality of the Circumstances

When the *Gingles* preconditions are met, the court then "considers whether, on the totality of circumstances, minorities have been denied an equal opportunity to participate in the political process and to elect representatives of their choice."  *Abrams v. Johnson*, 521 U.S. 74, 91 (1997) (internal quotation marks omitted; citing Section 2); *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 366 (5th Cir. 2001).  After hearing the evidence set out in more detail below, the Court FINDS that Plaintiffs have produced some evidence of racial bias in the electoral system in the factors of the totality of circumstances test.  Likewise, the Court FINDS that the State has advanced evidence of alternative explanations.

Therefore, the Court proceeds to consider the weight to be accorded to the evidence under each of the factors, and balances it to determine whether Plaintiffs, as Hispanic voters or an organization advocating for the interests of Hispanic voters, have had their voting power for electing justices and judges of Texas's high courts diluted on account of race.  Plaintiffs need not prevail on all or a particular number of the factors. *Clark*, 88 F.3d at 1401.  However, before a remedy may be imposed, the Court must be convinced that, on balance, the State has violated Section 2's concern over discrimination in elections on account of race.

### A. Discussion and Weighing of Factors

#### 1. History of Official Discrimination

Texas has a long history of official racial discrimination with respect to voting rights. *Veasey v. Abbott*, 830 F.3d 216, 257 n.53 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 612 (2017); 2 Tr. 11-15 (Dr. Henry Flores's testimony regarding Texas's poll tax, white primaries, and at-large voting for legislators). The vestiges of that discrimination continue to be felt in racial disparities in socioeconomic conditions, which depress political participation among minority voters. *Veasey, supra*.; *Teague*, 92 F.3d at 294; 2 Tr. 45-46. Noting this context, the Court focuses its analysis on recent evidence of discrimination. *See McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987).

The Fifth Circuit, sitting en banc, upheld this Court's finding that the 2011 Texas voter identification law produced discriminatory results. *Veasey, supra*. The State further defended a racial gerrymandering case addressing legislative districts, resulting in a Supreme Court holding that one such district was racially gerrymandered. *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018). Plaintiffs have not, however, identified any specific history of official discrimination with respect to establishing or maintaining the multimember nature of voting for the State's high courts. The Court thus FINDS that this factor has only slight weight, favoring Plaintiffs.

## 2. Racially Polarized Elections

The bulk of the evidence at trial involved the analysis of Texas high court elections since 2002,[9] demonstrating significant polarization.  While it is undeniable and effectively conceded that Hispanic-preferred candidates for judicial office have consistently fared poorly in statewide elections, the impetus behind that phenomenon is the crux of this case.  *See* 2 Tr. 180.  Plaintiffs claim that it is a racial issue; the State claims that it is a partisanship issue, which only happens to correlate with race.[10]  Thus, the decision requires parsing of closely aligned evidence of race and party.

Most of the election contests shine little light on this nuanced issue.  Time and again, when a general election race involved both major parties, the white-preferred candidate won over the Latino-preferred candidate.  Consistently throughout the election cycles considered here, the white-preferred candidate ran as a Republican and the Latino-preferred candidate ran as a Democrat.[11]  The two-major-party general election contests and their uniform results facially support equal inferences in favor of racial polarization and partisan polarization.  So the key lies somewhere outside of the macro-analysis of Republican versus Democratic candidate or Latino versus non-Latino voter.

---

[9]  Dr. Handley testified that she used this time frame because it provided a sufficient number of elections to support statistical conclusions and because 2002 was the first year the necessary data was available on the Texas legislative website.  2 Tr. 163.

[10]  Dr. Handley agreed that most Hispanics are Democrats or vote for Democratic candidates.  2 Tr. 197.

[11]  In 11 out of 13 contested general elections for statewide judicial offices from 2002 to 2016, Hispanic voters preferred the Democratic candidate at levels of 70 to 85%.  PX 124; 2 Tr. 202-203.  Most non-Hispanic voters preferred the Republican candidates, although 30 to 40% of non-Hispanic voters supported the Democratic candidates.  PX 124; 2 TR. 220.

**Race of the Candidate**.  Ordinarily, in considering vote dilution, the race of the candidate is not the relevant issue.  Instead, it is whether minority-preferred candidates (of whatever race) are consistently defeated.  *Gingles*, 478 U.S. at 68.  However, when faced with the challenge of determining whether race rather than partisanship explains polarization, looking at the race of the candidate may offer some insight.  *LULAC*, 999 F.2d at 854 (discussing the need to investigate built-in bias) and 861 (crediting evidence that there was consistency in partisanship even where the race of the candidate varied); 2 Tr. 234.

The State took great care to point out that the data shows a highly consistent correlation—across elections and election cycles—between racial group voting and political parties.  2 Tr. 209-20.  More to the point, the distribution of votes between political parties remained at comparable levels even when the race of the candidate varied or when the same candidate switched parties.  *Id.*; 2 Tr. 262-64.

As an important case in point, in 2016, Justice Eva Guzman—a Latina incumbent running as a Republican—did not get the Latino vote, which went to the Democratic candidate.  Justice Guzman nonetheless won more non-Hispanic support than white incumbent Justice Paul Green.  PX 124, p. 4.  In fact, Justice Guzman received more votes than any other candidate for statewide judicial office in Texas history.  DX 40, p. 4.

While Plaintiffs point out that this single example does not support a finding of a pattern of a lack of racial bias, it is consistent with other evidence demonstrating that the race of the candidate is less important to voters than the candidate's party.  In fact, whether running as Democrats or Republicans, Hispanic candidates for high judicial

office have tended to slightly outperform non-Hispanic candidates with non-Hispanic voters.  2 Tr. 223, 227; DX 25, DX 26.  This evidence supports a finding that partisanship is a better explanation for defeats of Hispanic-preferred candidates than racial vote dilution.

**Party Primaries**.   Dr. Handley concluded that two of the three Democratic primaries she analyzed were polarized and, between them, the Latino-preferred candidate won once and lost once.  2 Tr. 266-68.  These results do not reveal a pattern.  For that very reason, it is interesting to note that the premise for a Latino vote dilution claim erodes when only Democratic candidates are before the voters.  This is some evidence that partisanship is the dominant factor in election results.

On the flip side, Dr. Handley opined that Republican primaries were not probative because none of the three Republican primaries and the one Republican runoff she analyzed drew more than 1% of registered Hispanic voters.   2 Tr. 165, 183-85. Nonetheless, both she and Dr. Alford reviewed the data on those elections, using Dr. Alford's data because it more accurately controlled for low turnout.  Using his data for the Republican primaries and runoff she analyzed, Dr. Handley testified that the Hispanic-preferred candidate won all four.  2 Tr. 279; PX 126.  Expanding the analysis to 37 total Republican primaries or runoffs, half were racially polarized and half were not. 2 Tr. 188, 280; PX 132, 134.   Again, without the Democrat versus Republican dichotomy, data show that the premise for vote dilution erodes.

However, Plaintiffs argue that simply analyzing voting data understates the relative disenfranchisement of Hispanic voters because such analysis does not reflect the

phenomenon whereby Hispanic incumbents are more likely than white incumbents to draw primary challengers. That is, using Republican primaries for Supreme Court of Texas seats as an example, white candidates have challenged incumbent Latino justices at a rate of 80%, compared to just 50% for white incumbents. 1 Tr. 136-37. And when challenged, only 60% of Latino incumbents have prevailed, compared to 95% of white incumbents. 1 Tr. 137. The only white incumbent to lose, Steven Wayne Smith, lost multiple times against white opponents; his sole victory was against Hispanic Xavier Rodriguez. 1 Tr. 141, 145-46. Judge Elsa Alcala testified that her vulnerability as a Latina to this phenomenon influenced her decision not to seek reelection in 2018. 1 Tr. 265-67. This is some evidence that racial bias affects vote dilution.

**Races without a Democratic Candidate**. In approximately two-thirds of the analyzed general elections in which there was no Democratic candidate, Latino voters supported third-party candidates over Republican ones and the election was polarized. 2 Tr. 190 (11 out of 16 contests). However, with the exception of one race in which 60.4% of Latinos voted for the Libertarian candidate, the Latino support for the losing candidate did not exceed 60%, so those contests could not be considered cohesive. 2 Tr. 242, 246-57.

Other times, Latino voters joined non-Latino voters in supporting the Republican candidate. 2 Tr. 239-41, 247. As a result, those elections were not polarized. 2 Tr. 240-241. For instance, at the time of the analysis, only one sitting judge, Judge Alcala, had won election to a Texas high court as the Hispanic-preferred judge. 2 Tr. 199-200; PX 133. Judge Alcala ran in 2012 as a Republican and, with the support of a majority of

Hispanic voters, prevailed against a Libertarian candidate.  2 Tr. 199-200; PX 127.  These races support the conclusion that, once again, the evidence of vote dilution weakens when the Democrat-Republican partisan divide is absent.

The State's statistical analysis supporting the partisan explanation was compelling. In each area where racial bias fails and partisanship appears to dominate voter decisions, Plaintiffs have challenged the evidence as not probative.  However, as explained, this is a nuanced question and it depends not upon strong trends, but subtle cues.  The Court FINDS that partisan polarization better explains results in recent Texas statewide elections for high judicial office.  Because it is reflected only in non-dominant themes, and because the primary challenge phenomenon is concerning, the Court gives it only moderate weight.  Therefore, this factor weighs moderately in favor of the State.

### 3.  Practices that Enhance Discrimination in Voting

Under this factor, Plaintiffs cite three circumstances or practices in high court elections that enhance discrimination in voting:  (1) the unusually large election district; (2) the majority-vote requirement; and (3) the numbered-place requirement.  The Court will consider each in turn.

**Large District**.  The size of the election district is a function of the size of the state.  And the State's linkage interest will be addressed separately within.  While discriminatory intent is not a requirement of the burden of proof, nothing in Plaintiffs' evidence suggests that the State's at-large system was chosen or maintained because of its potential to dilute a racial minority's vote.

Given the lower socioeconomic status of minority voters, Plaintiffs' complaint is that the size of the district presents particularly formidable obstacles for minority-preferred candidates to campaign across the state and to raise sufficient funds to be competitive.  D.E. 102, pp. 22-23.  However, the challenges of physically covering the entire state are shared by all candidates.  And to the extent that additional funds are necessary, the socioeconomic legacy of discrimination is part of the fifth factor, addressed below.

**Fifty-Percent Threshold Majority Vote**.  The majority vote requirement ensures a runoff between the two candidates receiving the highest number of votes if no candidate receives over 50%.  While minority-preferred candidates have occasionally garnered the most votes when the white vote is split, a runoff often has the effect of pitting a minority-preferred candidate against a majority-preferred candidate.  This precise scenario occurred with respect to the 2012 Republican primary election that included Justice David Medina, who earned the most votes cast in a three-way race, but lost the runoff to the majority-preferred candidate who went on to win the general election.  2 Tr. 186-87.  The record contains no evidence of the rationale for imposing the majority vote requirement.  This works in Plaintiffs' favor.

**Numbered Place**.  According to Plaintiffs, the numbered-seat requirement offers two features that work to disadvantage minority voters.  First, it allows the majority to use its dominant voting position to prevent a cohesive minority from succeeding in any of the individual judicial races.  *Rogers v. Lodge*, 458 U.S. 613, 627 (1982).  Second, it allows candidates to challenge specific incumbents, more often the incumbents preferred

by the minority.  *See generally* 1 Tr. 247.  These arguments are two sides of the same coin.  And the Supreme Court has held that the use of a numbered place system is not infirm, merely because it has this effect.  *Whitcomb*, 403 U.S. at 159.  Indeed, Dr. Henry Flores was unaware of any state electing multimember bodies that does not use a place system.  2 Tr. 82.

The Court FINDS that the practices associated with a large multimember district with a majority vote requirement and numbered places have little weight because there is no evidence that racial bias rather than practical necessity motivated the adoption of these practices.  That weight slightly favors Plaintiffs

### 4.   Exclusive Slating Processes

The Texas system of voting for justices and judges for the high courts does not involve a formal slating process.  Yet candidates can achieve an incumbency advantage if first appointed by the governor to fill an unexpired term.  This is a fairly common scenario, as over half of the justices who have held seats on the Supreme Court of Texas and a third of the judges on the Court of Criminal Appeals over the analyzed period began their tenure with gubernatorial appointments.  2 Tr. 31, 33; 3 Tr. 28-30; PX 106, 106A.

While all of the governors responsible for selecting the appointees have been white and the majority of appointees have been white, Latinos who have been appointed to high judicial office have enjoyed some incumbency advantage, even if it is less of an incumbency advantage than white judges and justices.  For instance, Supreme Court Justices Medina and Guzman and Court of Criminal Appeals Judge Alcala all won

34

reelection after their appointments.  1 Tr. 142; 2 Tr. 102.  In addition, there is some evidence that Republican governors have prioritized appointing Latinos to high judicial office and have looked beyond members of their own party when considering candidates for appointment.  *See* 3 Tr. 74-75, 174.  But for instance, Justices Linda Yanez and Gina Benavides, both of whom are Democrats who have served on the Thirteenth Court of Appeals, chose not to pursue potential appointments at least in part because they were asked to pledge to run for reelection as Republicans.  They declined the appointments because they either identified more with the Democratic party or because they did not believe that they could get elected as Republicans.  *Id*.

Plaintiffs discount this evidence as anecdotal.  And it does not account for eventual targeted challenges from white candidates in the Republican primaries, making the advantage of incumbency less useful for Hispanic candidates in the long run.

In short, it appears that once appointed, Hispanic judges and justices enjoy less of an incumbency advantage than non-Hispanic judges and justices and they face a greater likelihood of drawing a primary challenger.  Yet at least in some instances, partisanship has interfered with Hispanic candidates accepting incumbency's advantages.  On the whole, the competing forces involved in accepting and benefiting from appointments and incumbency are such that the Court gives this, as a slating issue, little weight and neutral benefit between the parties.

### 5.  Legacy of Discrimination Hindering Minority Participation

As noted above, Texas is no stranger to discrimination against Hispanics.  It is also undisputed that Latinos, generally speaking, suffer a socioeconomic status and voter

registration rate significantly lower than those of whites.  2 Tr. 35-46; PTX 102, 103, 104, 104A, 105A, 109, 110.  Therefore, Plaintiffs argue that the fifth factor weighs in their favor.

The State argues that Plaintiffs have failed to establish a causal nexus between the history of discrimination and Latino's current weaker political power.  2 Tr. 97-98.  But the Fifth Circuit has held that such causal evidence is unnecessary when the history, socioeconomic status, and political conditions are aligned as they are here.  *Teague*, 92 F.3d at 294.  The Court gives this factor heavy weight in favor of Plaintiffs.

### 6.  Racial Appeals

The evidence contains a single instance of a patent racial appeal in a judicial race. Justice Yanez testified that, during her supreme court candidacy, her white opponent's surrogates argued that she was and, if elected, would be a representative of the Mexican government on the Texas court.  3 Tr. 170-71, 182.  Because this is the only such instance of racial appeals offered, this merits slight weight in Plaintiffs' favor.

### 7.  Number of Successful Minority Candidates

It is undisputed that no Latino candidate has ever been elected to the Supreme Court of Texas or the Texas Court of Criminal Appeals without first having been appointed to an unexpired term.  Of 18 appointments to both courts from 1996 to 2016, only five (27%) were given to Hispanics.  DX 42.  The evidence noted above shows that there might have been more Hispanic appointments, but they were declined, either for partisan reasons or a belief of inability to get elected as a Republican.  And whatever the number of appointments, the reduced incumbency advantage likely makes high judicial

office less attractive for Hispanic attorneys who might otherwise be inclined to pursue appointments.

This is reflected in the overall underrepresentation of Hispanics on the high courts which persists, despite the large number of Latino attorneys qualified to run for the high court positions. DX 32, 33. *See generally Johnson*, 512 U.S. at 1014 n.11; *LULAC*, 999 F.2d at 865. The statistical gap between voting population and successful candidates is not quite as extensive as Plaintiffs represent, because their statistics include a broad time period going back to 1945 and 1966 for the high courts. PX 106rev, 106A. Yet their quantitative analysis of racially polarized voting dates back only to 2002. The Court does not credit statistical evidence of the alleged effect of vote dilution that predates the evidence of vote dilution as the cause. *See Uno*, 72 F.3d at 990 (vote dilution must be evaluated in the present tense).

As the State notes, Hispanic candidates for high judicial office running as Democrats have suffered the same fate as nearly all Democrats running in statewide elections since 2002. At the same time, Justice Guzman, a Latina running as a Republican, received the most votes of any Supreme Court of Texas candidate in history. DX 40, p. 4. When the issue is whether race or partisanship explains the pattern of electoral outcomes, rather than whether or not there is vote dilution, this factor's significance evaporates. The influences on the number of successful minority candidates are better explained by other factors in the totality of the circumstances test. The Court treats this factor as neutral.

### 8.  Lack of Responsiveness to Minority Needs

Plaintiffs point out that the high courts have jurisdiction over many issues of particular interest to Hispanics.  However, they have not identified any examples of decisions that are non-responsive to minority needs or wrongly decided in the overall interest of equal justice.  The Texas Office of Court Administration Public Trust and Confidence in the Court Survey, upon which Dr. Jose Juarez relied, found that Hispanics, as a racial group, expressed the highest degree of confidence in the courts.  1 Tr. 212.  And unlike other elected officials, those in judicial positions or candidates for such positions, cannot espouse a special interest agenda.  Thus, this factor has slight, if any, weight in the balance of the totality of the circumstances and it is neutral here.

### 9.  Tenuous Reasoning Behind Methodology—Linkage

The Court recognizes that its consideration of the State's method of selecting judges implicates important concerns of federalism.  For instance, when considering issues related to a state's mandatory retirement age for judges, the Supreme Court wrote:

> Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign.  "It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers . . . should be exclusive, and free from external interference, except so far as plainly provided by the Constitution of the United States."

*Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Taylor v. Beckham*, 178 U.S. 548, 570-571 (1900), and citing *Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135, 161 (1892)).

At-large judicial districts have a salutary function. "The distrust of judicial subdistricts does not rest on paternalism. It recognizes Texas' historic interest in having district judges remain accountable to all voters in their district." *LULAC*, 999 F.2d at 873.

> The decision to make jurisdiction and electoral bases coterminous is more than a decision about how to elect state judges. It is a decision of what constitutes a state court judge. Such a decision is as much a decision about the structure of the judicial office as the office's explicit qualifications such as bar membership or the age of judges. The collective voice of generations by their unswerving adherence to the principle of linkage through times of extraordinary growth and change speaks to us with power. Tradition, of course, does not make right of wrong, but we must be cautious when asked to embrace a new revelation that right has so long been wrong.

*LULAC*, 999 F.2d at 872. The Court thus proceeds with caution.

Plaintiffs criticize the State for not submitting evidence of its linkage interest. Yet, as noted above, it is a question of law. "[T]he weight of a state's interest has always been a legal question, not a factual one." *Id*. at 871. It is true that the *LULAC* case involved trial court judges instead of high court appellate judges. Still, any differences in the State's interest associated with what constitutes high court appellate judges are entitled to some deference.

Law professor and legal historian, Michael Ariens, testified that Texas tried several alternate systems before settling on the statewide, at-large election model for its high courts for purposes of promoting independence and accountability. Under the 1836 Constitution of the Republic of Texas, the legislature elected the justices. Associate justices, assigned to divisions of the state, had both trial and appellate functions, while

the chief justice had exclusively appellate jurisdiction.  Jointly, their jurisdiction was coterminous with the geographical limits of the state.  3 Tr. 87-88.  In 1845, Texas adopted a gubernatorial appointment method.  *Id.*, p. 90.  A referendum resulted in a constitutional amendment approved by popular vote and ratified by the legislature, effective in 1850, which provided for the popular election of supreme court justices.  *Id.*, pp. 90-91.  In 1869, when Texas was under congressional reconstruction, supreme court justices were nominated by the governor and confirmed by the senate.  *Id.*, p. 94.

Since 1876, the Texas constitution has required statewide popular election for all justices for the Supreme Court of Texas.  *Id.*, pp. 95-96; Tex. Const. art. V, § 2.  The same is true with respect to the judges of the Court of Criminal Appeals, since 1891.  Tex. Const. art. V, § 4.  Furthermore, the corresponding jurisdiction of both high courts has been coterminous with the limits of the State.  Tex. Const. art. V, §§ 3, 5.  Just because the State's adoption of this method of judicial selection is at the constitutional level and dates back to 1876 does not make it immune from attack.[12]  However, it is indicative of the State's deliberate choice, left undisturbed over significant time and with substantial alternate experience, for governing its citizens.

Plaintiffs argue that linkage is not a compelling state interest at the level of the high courts because all nine justices and judges on each court rule as a collegial body, with each individual justice having an opportunity to affect case outcomes.  *See generally LULAC*, 999 F.2d at 873 (distinguishing the issue of single-member trial courts).  "The

---

[12]   Plaintiffs point out that the 1876 Texas constitution had provisions that have been challenged and eliminated, such as male-only juries, paupers not allowed to vote, poll taxes, and mandated school segregation.  Tex. Const. of 1876, art. V, § 13; art. VI, §§ 1, 3; art. VII, § 7, available at:  http://tarlton.law.utexas.edu/constitutions/texas1876.

ability to bring diverse perspectives to the court, not the prospect of outright dealmaking, would be relevant in [an appellate court] context." *Nipper v. Smith*, 39 F.3d 1494, 1535 n.78 (11th Cir. 1994).  Dr. Juarez testified that, in the context of a multimember body, single-member districts are preferable because they:  advance judicial effectiveness; balance accountability and judicial effectiveness; ensure judicial independence; and avoid prejudice and bias towards the parochial interest of a narrow constituency.  1 Tr. 152-62.  *See also LULAC*, 999 F.2d at 869 (quoting John L. Hill, Jr., *Taking Texas Judges Out of Politics:  An Argument for Merit Election*, 40 Baylor L. Rev. 339, 364 (1988) (emphasis omitted)).

Even assuming some benefit, however, single-member districts have fundamental drawbacks.  For instance, the State notes that it would inject legislative control into the drawing of judicial districts, contrary to the State's sovereign interest in a governing model that includes separation of powers.  *See generally* Tex. Const. art. V, § 7a(g), (h) (providing for legislative oversight and approval of the determinations of a Judicial Districts Board created to reapportion the state's judicial districts); Tex. Gov't Code § 22.201 (setting out legislatively-approved composition of courts of appeals districts).

It would also reduce any given voter's opportunity to have an impact on the personnel on the courts from a vote for each of nine (the full composition of the courts) to one justice or judge on each court (or one vote for the judge or justice from one's own district and one vote for the chief judge or justice to be elected at-large).  This is significant because the Supreme Court of Texas is empowered to determine cases by a majority vote of five justices.  Tex. Const. art. V, § 2.  The Court of Criminal Appeals

decides cases in panels of three and by a vote of two judges, unless convened en banc, in which case a vote of five judges will determine the case.   Tex. Const. art. V, § 4.   The collegial nature of a multimember body does not prevent it from, in practice, running roughshod over any given minority of judges.   Single-member districts could have the unintended effect of increasing the power of a majority of judges elected from districts with wider polarization levels in favor of white voters.

The State also points out that the creation of single-member districts, as Plaintiffs advocate, is not a foregone conclusion even if they prevail.   Single-member districts are only one remedy that might ultimately be imposed if liability is found.   D.E. 106, p. 15. *See Clark*, 21 F.3d at 95 ("If a § 2 violation is found, the [state] will be given the first opportunity to develop a remedial plan.").   But Plaintiffs have predicated this entire case on the argument that it is the at-large method of voting that is infirm.   If that method has a purpose, it is entirely appropriate to consider that purpose in determining whether liability should be imposed.   The Court gives this factor heavy, but not dispositive, weight in favor of the State.

### B.  Summation of the Totality of the Circumstances

Having considered each of the established factors, the Court has assigned each its weight and has determined which party is favored by each individual factor.   When all factors are considered together, the Court FINDS that, given the totality of the circumstances, Plaintiffs have not satisfied their burden to show that the voting methodology results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.   Instead, the Court FINDS that partisanship

rather than race better explains Hispanic defeat at the polls and the evidence was insufficient to overcome that, combined with the State's linkage interest.

## CONCLUSION

Plaintiffs Araiza, Solis, Rodriguez, and LUPE have standing to bring their claims. While Plaintiffs did satisfy the three *Gingles* preconditions for complaining of vote dilution, the Court concludes that they did not also demonstrate that race rather than partisanship better explains their preferred candidates' lack of success at the polls and they did not overcome the State's interest in electing Supreme Court of Texas justices and Court of Criminal Appeals judges in an at-large system, coterminous with the geographic limits of the State.  The State is entitled to judgment that Plaintiffs take nothing by their claims.

ORDERED this 12th day of September, 2018.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE